## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

FRATELLI COSULICH     *
UNIPESSOAL, S.A.     *
(f/k/a FRATELLI COSULICH     *
CONSULTADORIA     *
E PARTICIPACOES     *
UNIPESSOAL, LDA), a Portuguese     *
corporation,     *
    *
     Plaintiff,     *     **CV - 13-545-KD-C**
    *
vs.     *
    *     **JURY TRIAL REQUESTED**
SPECIALTY FUELS BTU, LLC, an     *
Alabama limited liability company;     *
F. JAVIER BRITO, an Alabama     *
citizen; and, BUNKERS     *
INTERNATIONAL CORP.,     *
a Florida corporation,     *
    *
     Defendants.     *

## THIRD AMENDED COMPLAINT

### Parties

1.     Plaintiff, Fratelli Cosulich Unipessoal, S.A. (formerly known as "Fratelli Cosulich Consultadoria E Participacoes Unipessoal, LDA")(hereinafter "Cosulich"), is a foreign (alien) corporate entity incorporated under the laws of the Country of Portugal, specifically, the Portuguese Companies Code and

1

Decree/Law NR 212/94 which applies to Madeira Free Trade Zone Stock Corporation Companies like Cosulich. Cosulich has the same or similar "characteristics" and can be "best understood" as a "corporation" under U.S. law. The designation "S.A." stands for "Sociedade Anonima" which, under Portuguese law, signifies it as a "stock corporation company", a designation separate and distinct from a "Sociedade Comandita por Accoes", or a "partnership by shares". Under these foreign laws, "S.A." shareholders are free from personal liability and their liability is limited to the shares to which they have subscribed; it is the "S.A.'s" assets which must respond to creditors. The Portuguese Company Code requires that "S.A.s" be incorporated with a minimum of five (5) shareholders. Ownership in the company is represented by shares. The "S.A." is formed and operates under Articles of Association which establishes a Board of Directors. The company name must be chosen by the shareholders and registered with the National Registration of Portuguese Companies, and the designation "S.A." must follow the name. Decree/Law NR 212/94 allows for Madeira Free Trade Zone Stock Corporation Companies to be incorporated or held by one shareholder. For these corporations, Portuguese law requires the company name to include the term "Unipessoal". As noted by its full name, Cosulich is owned by a single shareholder. That shareholder is an Italian corporation with its principal place of

business in Italy.

Cosulich is not incorporated in any other country or foreign (alien) state, or in any state of the United States. Cosulich's principal place of business is located in Madeira, Portugal.

For purposes of establishing citizenship, Cosulich is a foreign (alien), incorporated business entity organized under the laws of the Country of Portugal with its principal place of business located in Portugal.

Cosulich is engaged, in part, in the business of vessel bunkering and the trading of fuel oil and fuel oil by-products. Cosulich, through its agent in the United States, Asamar Inc. (referred collectively as "Cosulich"), provided credit terms to Specialty Fuels Bunkering, LLC (hereinafter "Bunkering"), and Specialty Fuels BTU, LLC, in connection with certain purchases and sales of fuel oil and fuel by-products.

2. On November 6, 2013, Specialty Fuels Bunkering, LLC ("Bunkering"), was a domestic, limited liability company formed under the laws of the State of Alabama, with its principal place of business located in Mobile County, Alabama. On information and belief, Bunkering was not formed under the laws of any other state of the Union or of any foreign (alien) nation. At the time of the filing of the Plaintiff's Original Complaint on November 6, 2013, Bunkering

had two members: F. Javier Brito and CCC Holdings, LLC. F. Javier Brito was, and is, an adult citizen of the United States who was, and is, domiciled in Baldwin County, Alabama. CCC Holdings, LLC, is a domestic, limited liability company formed under the laws of the state of Alabama with its principal place of business located in Mobile County, Alabama. On information and belief, CCC Holdings, LLC, was not formed under the laws of any other state of the Union or of any foreign (alien) nation. On November 6, 2013, the date of the filing of the Original Complaint, CCC Holdings, LLC, had one member, Scott Cleveland. Scott Cleveland is an adult citizen of the United States who was domiciled at that time in Mobile County, Alabama.

At all times material to the claims asserted by Plaintiff, Bunkering was a purchaser of fuel oil product under stem number 6322 and, arguably, 6277 as described below. On November 14, 2013, subsequent to the filing of Cosulich's Original Complaint, Bunkering filed for bankruptcy protection pursuant to Chapter 7 of the U.S. Bankruptcy Code in the United States District Court for the Southern District of Alabama, Southern Division [Case Number 13-04041]; consequently, pursuant to the automatic stay provisions of the Bankruptcy Code, Cosulich is not prosecuting claims against Bunkering within these proceedings. Allegations herein relating to Bunkering are for informational and contextual purposes only and are

not to be construed by anyone as an attempt to state claims against it herein.[1]

3.    Defendant, Specialty Fuels BTU, LLC ("BTU"), is a domestic, limited liability company formed under the laws of the State of Alabama and with its principal place of business located in Mobile County, Alabama.  On information and belief, BTU was not formed under the laws of any other state of the Union or of any foreign (alien) nation. On November 6, 2013, the date of the filing of the Plaintiff's Original Complaint, BTU had one member, F. Javier Brito.  F. Javier Brito was, and is, an adult citizen of the United States who was, and is, domiciled in Baldwin County, Alabama. At all material times, BTU was a purchaser of fuel oil product under stem number 6277 and, arguably, 6322.  BTU is wholly owned and managed by an individual defendant herein, F. Javier Brito, who is the alleged managing member of Bunkering.  BTU as alleged herein is also the alter ego of Bunkering.

4.    Defendant, F. Javier Brito (hereinafter "Brito"), is an adult citizen of the United States and is domiciled in Baldwin County, Alabama.  At all times material to this Amended Complaint, Brito was the principal founder, investor, member and, currently, the disputed managing member of Bunkering.  On information and belief, Brito was the principal founder, investor, member and,

---

[1]All rights and remedies which Cosulich may have with respect to Bunkering are expressly reserved for proceedings in the U.S. Bankruptcy Court as referenced.

currently, the managing and sole member of BTU. At all times material to this Amended Complaint, Brito treated Bunkering and BTU as his alter ego, disregarded corporate form, acted on insider information to his personal financial benefit, engaged in waste with respect to Bunkering and BTU to his personal financial benefit, and otherwise engaged in conduct which would legally justify disregarding the corporate entity and piercing the corporate veil so as to render Brito personally liable to Cosulich for the actions and obligations of Bunkering and BTU, jointly and separately.

5. Defendant, Bunkers International Corp. ("BI"), is a domestic corporation, incorporated under the laws of the state of Florida with its principal place of business located in Lake Mary, Florida. Upon information and belief, BI is not incorporated under the laws of any other state of the Union or of a foreign (alien) nation. For a prolonged period of time spanning several years and at all times material to this Amended Complaint, BI engaged in commercial activities purposefully directed to Cosulich, Bunkering, BTU, and Brito within the jurisdiction of this Court, namely, Mobile and Baldwin Counties, Alabama. These commercial activities, described *in part* by the allegations of this Amended Complaint, establish sufficient contacts within the State of Alabama and the venue of this Court to confer *in personam* jurisdiction over BI in this lawsuit. Personal

jurisdiction is also conferred pursuant to Alabama's long arm statute: Rule 4.2(b), Alabama Rules of Civil Procedure. At all times material to this Amended Complaint, BI acted by and through its duly authorized and appointed agents, servants and employees, including, but not limited to, its Chairman and CEO, John Canal and its "Vice President of Business Development and Strategic Initiatives", Paul Pappaceno (hereinafter "Pappaceno"), and is directly liable to Cosulich for all acts or omissions of its agents, servants and employees.

## Jurisdiction

6. This is a civil action for claims at law and in equity within the meaning of the Acts of Congress; jurisdiction is based upon 28 U.S.C. §1332 (diversity) as the matter in controversy exceeds $75,000.00 exclusive of interest and costs and there is complete diversity of citizenship between the parties.

## Facts

7. Cosulich adopts and realleges the allegations of paragraphs 1 through 6 of its Amended Complaint as if fully set forth herein.

8. At all times material to this Complaint, Bunkering and BTU were engaged in the business of wholesale supply of fuel products. They operated, jointly and/or separately, by buying fuel components, blending them to make specific types of fuel, and then selling the finished fuel or fuel oil by-product to a

buyer. This type of operation required enough capital or credit on the part of Bunkering and BTU to enable each entity to purchase the component parts of the fuel, store them, blend them, sell them, deliver the product and then await payment. Bunkering and BTU engaged in business in such a manner, and through representations by their representatives and BI, that Cosulich considered them to be essentially the same company, "Specialty", owned, managed and controlled by one person, Brito.

### FACTUAL ALLEGATIONS AS TO BUNKERS INTERNATIONAL

9.    Prior to 2011, Cosulich concluded numerous transactions with Bunkering and BTU by dealing with them directly. All of these transactions involved Pappaceno who, at that time, was an employee of Asamar Inc., Cosulich's agent in the United States.

10.    In late 2010, Pappaceno began working for BI. Shortly thereafter at Pappaceno's urging, he and Cosulich's management orally agreed that BI would act as Cosulich's broker for all Bunkering and BTU transactions.

11.    From the time that Pappaceno began working for BI through and including one or both of the transactions that are the subject of this lawsuit, all of the Cosulich transactions and dealings with Bunkering and BTU were conducted solely through Pappaceno and his employer, BI, as broker for Cosulich, and as the

exclusive representative of Bunkering, BTU and Brito.

12. In consideration for these services, BI received monetary commissions from Cosulich on the transactions.

13. The transaction(s) involved can be described as a close-in-time purchase (by Cosulich) and sale (by Bunkering or BTU) of oil or fuel oil by-product on the promise that "Specialty" (i.e., Bunkering or BTU, depending on the transaction), would buy the product back at a higher price. These transactional arrangements were always closely tied to the existence and maintenance of the fuel-based product which was central to the business transaction and which can, and did, serve as security for the funds provided by Cosulich.

14. During this time frame, Pappaceno, on behalf of BI, demanded that Cosulich not directly contact anyone at Bunkering or BTU which resulted in Pappaceno and BI becoming the sole intermediary and conduit for information between Cosulich and "Specialty" (Bunkering and BTU). Because of this insistence, Cosulich was placed into a position of having to trust that Pappaceno and BI would provide it with timely and accurate information concerning "Specialty's" financial ability to perform on the transactions, among other things.

15. Over this same considerable time frame, Pappaceno and BI, for their own financial gain, cultivated a position of trust and confidence with Cosulich in

its dealings with all of the Defendants herein by reassuring Cosulich that they could be trusted and relied upon. Facts which reasonably evidence the creation of a position of trust and confidence by BI are, in part, as follows:

    a.    On February 2, 2012, Pappaceno posted an "instant message" ("IM") to Cosulich [involving an issue of whether Cosulich received funds from another entity, "Plaza" which were to be used to pay a "Specialty" invoice] in which he expressly stated to Cosulich's representative that "**You can trust me**". (Emphasis added.);

    b.    On May 15, 2012, Cosulich posted an IM to Pappaceno concerning "Specialty's" tardiness on performing on a pending transaction. On May 16, 2012, BI, through Pappaceno, responded to the prior IM stating, at times, that he, "Spoke with Specialty late yday (sic)…He [presumably Brito] is not able to pay anything this week…**Don't worry**." (Emphasis added.);

    c.    Throughout all of the transactions and course of dealings, BI made it known to Cosulich that, with respect to Bunkering BTU and Brito, it had a far more extensive relationship than

just that of a broker and exclusive agent for the Cosulich transactions. BI disclosed to Cosulich that it had acted as a factor for Bunkering and/or BTU in the past and, in fact, purchased Bunkering's invoices from Cosulich on at least two occasions in 2010, such that BI paid "Specialty's" financial obligations to Cosulich as part of its factoring arrangement;

d.    Cosulich reasonably inferred from this arrangement that BI, more than a typical broker might be, was privy to detailed financial information about the business operations of Bunkering BTU and Brito such that BI had enough of a comfort level to take the risks associated with acting as those entities' factor.

e.    BI also made it known to Cosulich that with respect to Bunkering, BTU and Brito it had a far more extensive relationship than just that of a broker and exclusive agent for the Cosulich transactions. BI disclosed to Cosulich that it also bought and sold fuel oil and fuel oil by-products, as a principal on extended credit terms with Bunkering and BTU (including in some instances participation in the same transactions that

Cosulich had committed to with Bunkering and BTU). Cosulich

reasonably inferred from this knowledge and information that

BI, unlike a typical broker, was by its own conduct vouching

for Bunkering and BTU's reliability as financially sound and

responsible business entities (known and routinely referred

to collectively as "Specialty") when it solicited Cosulich

to do business with those entities;

f.    BI's employee and agent, Pappaceno, informed Cosulich that

he had invested his personal funds in Bunkering and/or

BTU. This information reasonably indicated to Cosulich that BI

was not engaged in typical broker conduct or involvement with

a principal and further engendered a feeling of trust, reliability

and confidence for Cosulich with respect to the BI brokered

dealings with Bunkering and BTU;

g.    BI caused Cosulich to believe that all funds provided by

Cosulich to "Specialty" were tied to and secured by a product

or cargo.

16.    During this same time frame, Pappaceno and BI also cultivated its

position of trust with Cosulich by engaging in a course of conduct, and through

written and oral representations, which were designed to demonstrate their close relationship with Brito and "Specialty" including their apparent, if not actual, insider position with Bunkering and BTU. For example, Pappaceno and BI repeatedly and consistently informed Cosulich as to the status of payments to Cosulich by "Specialty" by means of direct, personal contact with "Specialty". This is evidenced, in part, by the following:

   a.   IM from Pappaceno to Cosulich dated February 8, 2012: "I just rcvd (sic) a call from Specialty… He [presumably Brito] said the money did not go out today because he forgot that the funds needed to be sent by 3:30 his time. And he will send them tmrw (sic)."

   b.   IM from Pappaceno to Cosulich dated March 8, 2012, in which Pappaceno represented he will check with Specialty on payment of funds to Cosulich.

   c.   IM from Cosulich to Pappaceno dated March 13, 2012, requesting that Pappaceno check on status of payment by "Specialty" (demonstrating that Cosulich was dependant and reliant on Pappaceno and BI for information). Pappaceno responded, "i (sic) will ck (sic)".

d.   IM from Cosulich to Pappaceno dated April 3, 2012, in which Cosulich informed Pappaceno and BI that Specialty had a transaction "expiring on 5th 1,575,999". Pappaceno responded that he will "…see when he [presumably Brito] is paying".

e.   IM from Pappaceno and BI to Cosulich dated May 15, 2012, concerning payment by "Specialty" on a Cosulich invoice, in which Pappaceno promised to "…talk with him [presumably Brito] later in the morning about getting the other one paid" and "i (sic) will ck (sic) to see what he can do." Pappaceno followed up the next day by posting the following IM to Cosulich: "I spoke with Specialty late yday (sic). He [presumably Brito] is not able to pay anything this week…"

17.   This course of conduct and dealings between Cosulich and Bunkering and BTU, through Pappaceno and BI, continued in like fashion through and including the two transactions at issue in this case.

18.   Through this conduct and course of dealings over time, BI created and assumed certain duties, including the duty to conduct its brokerage activities with reasonable skill and diligence, the duty to engage in due diligence, and the duty to inform Cosulich, its principal, of material information it acquired through the

exercise of reasonable diligence, as a result of its expansive, close individual dealings with Bunkering, BTU and Brito. These interactions include, in part, the following:

    a.    insisting on being the sole intermediary between the parties to the transaction which relegated reliance by Cosulich on what information BI chose to impart to Cosulich. Because BI insisted on this relationship, it knew that Cosulich was in this position of reliance and that Cosulich was dependent upon BI to provide it with accurate and material information regarding any adverse change in business circumstances, including the worsening financial position of Bunkering and/or BTU;

    b.    demonstrating to Cosulich that BI had a close, real-time, insider relationship with Bunkering, BTU and Brito which was designed to foster and cultivate a position of trust and reliability so that Cosulich would engage in the transactions that BI was soliciting and to induce Cosulich to transact millions of dollars in sales; and,

    c.    by soliciting funds from Cosulich to engage in transactions with "Specialty", BI represented that Bunkering and BTU were

financially able to perform on the transactions as each had done historically, including in transactions that involved BI as a principal, and which further indicated that BI had been, and was performing due diligence with respect to Bunkering and BTU.

19. All of this created a custom and practice over time between BI and Cosulich and established a course of dealings upon which Cosulich reasonably relied and placed its trust as was intended by BI and resulted in the creation of a "special" or fiduciary relationship between Cosulich and BI.

20. BI knew or should have known that Cosulich was relying on BI to act with all reasonable care and skill commensurate with its duties as its exclusive broker, agent, and sole intermediary with Bunkering and BTU and that Cosulich was relying on BI to provide it with accurate and timely material information regarding the transactional risks, and disclose information about Bunkering and BTU's worsening and failing financial condition and other material information it knew or should have known concerning their businesses.

21. In return for Cosulich's reliance on Pappaceno's and BI's representations and efforts, BI secured millions of dollars worth of extended credit from Cosulich for Bunkering and BTU and earned brokerage commissions for itself. In addition, BI may have also lessened direct financial risk to itself for any

credit which it may have extended to Bunkering and BTU during the same time frame by securing for Bunkering and BTU the ability to perform debt service to it (BI) through receipt of funds provided by Cosulich.

**GENERAL FACTUAL ALLEGATIONS AS TO ALL DEFENDANTS**

22. In July 2012, representatives of Cosulich traveled to Mobile, Alabama, and met directly with representatives of Bunkering, BTU and BI, including, among others, Brito and Pappaceno. During this visit, Cosulich was given a tour of storage tank facilities in the Port of Mobile and was told by these representatives that Brito's businesses, Bunkering and BTU, were expanding, that they were planning further growth, and hoped to do business with Cosulich in their expansion. BI directly participated in these marketing activities.

23. On May 29, 2012, Bunkering commenced litigation against Brito in the Circuit Court of Baldwin County, Alabama, in which other members of Bunkering sought, among other things, to wrest control of Bunkering from Brito. Brito as a party, and BI as Bunkering's factor, business co-venturer, special agent and insider, either had actual knowledge of this litigation or should have known of it at the time of the July 2012 visit by representatives of Cosulich as described in paragraph 20, above.

24. During this time, neither Brito, Pappaceno, or any other representative

of Bunkering, BTU or BI stated, indicated, advised or otherwise made known to Cosulich that management of Bunkering, namely, Brito and Scott Cleveland (hereinafter "Cleveland), was engaged in pitched litigation pending in the Circuit Court of Baldwin County, Alabama (hereinafter "litigation"), for control of Bunkering's business operations and that such was preventing Bunkering from being able to meet its financial obligations, *including financial obligations it owed to BI* as its trading partner. Indeed, Brito filed pleadings in June 2012 in that litigation, one month or less before the July 2012 visit by Cosulich, in which he represented, on behalf of himself[2] and Bunkering[3], among other things, that because of the management dispute with Cleveland,

    a.    Bunkering's financing sources, expressly including BI, were not being paid and that Bunkering's customers' ships or vessels were at risk of seizure by BI;

    b.    Bunkering was losing the trust and good will of its customers thereby damaging Bunkering's ability to do business in the future;

    c.    Bunkering's relationship with BI (a finance source) was being

---

[2]Brito was named individually as defendant in that litigation.

[3]Brito brought a counterclaim as managing member of Bunkering in that litigation.

"irreparably damaged";

    d.    Bunkering's ability to conduct business in general was being "irreparably damaged".

25. It is self evident from these pleadings, and the specific allegations referencing BI, that BI was more than a mere broker; it was an active business partner or co-venturer with Bunkering, BTU and Brito. Insofar as it was pled by Bunkering that BI's financial relationship with Bunkering was "irreparably damaged" as result of the problems caused by the litigation, BI must have had actual knowledge of the management dispute and the Baldwin County litigation that was causing critical, adverse financial problems for Bunkering in the latter months of 2012. Insofar as BI undertook to act as Cosulich's exclusive broker and sole conduit for information in its dealings with Bunkering and BTU, BI had a duty to disclose the material information it learned during this time.

26. As shown and alleged by the pleadings filed in the litigation, the aforesaid financial difficulties created by the litigation continued and, in fact, worsened over time such that the ability of Bunkering and BTU to do business as normal became materially impaired. Both entities as a result of this were in a more precarious and worsening financial position and became increasingly unable to perform on their financial obligations.

27. BTU, Brito, and BI, based on BI's close business relationship and insider position as alleged above, knew or should have known of this worsening financial condition and did not inform Cosulich of these dire financial circumstances at that time, and certainly before they transacted with Bunkering and BTU through BI on stems 6277 and 6322 in January and April 2013, respectively, as described below.

28. During the months of January and April 2013, Cosulich transacted business with BTU (through BI), and directly with Bunkering (with BI involvement as well), respectively, in good faith, on stems 6277 and 6322 by providing millions of dollars in product sales to Bunkering and BTU which were routinely and collectively referred to by Bunkering, BTU, Brito and BI as "Specialty". See allegations of paragraph 16, above. As a result, Cosulich understood that each business was essentially "one and the same" and were owned and managed by Brito.

29. The terms on each of these transactions between Cosulich and Bunkering and BTU were thirty (30) days. On the two stems at issue, Bunkering and BTU requested that the credit terms be "rolled over" several times to which Cosulich agreed. At all times, BI, as Cosulich's exclusive broker and agent, through Pappaceno, was informed and had actual knowledge of these transactions

and the fact that the obligations on these two stems were being "rolled over". The transactional details are as follows:

a. **STEM 6277:** On or about January 11, 2013, Cosulich paid BTU the amount of $2,828,322.00 for the purchase of 22,447 barrels of cutterstock under stem number 6277 (BTU invoice 130111-2) and on January 14, 2013, Cosulich issued its Pro Forma invoice to BTU and/or Bunkering in the amount of $2,857,503.10. Thereafter, the following set of rolled over invoices was issued by Cosulich to BTU and/or Bunkering:

1)  Pro Forma of invoice 6277 dated February 27 for $2,886,684.20 (60 days);

2)  Pro Forma of invoice 6277 dated April 17 for $2,945,046.40 (120 days);

3)  Pro Forma of invoice 6277 dated April 17 for $2,974,227.50 (150 days);

4)  Pro Forma of invoice 6277 dated July 10 for $3,032,589.70 (210 days);

On or about July 24, 2013, Cosulich received a partial payment on stem 6277 of $1,500,000 allegedly by or on behalf of BTU. On August 12, 2013, Cosulich issued its Pro Forma invoice 6277 to BTU and/or Bunkering for the

balance remaining: $1,532,589.70.

The total owed to Cosulich by BTU and/or Bunkering on stem 6277 is **$1,532,589.70**, plus interest. [BTU/Bunkering and Cosulich invoices pertaining to stem 6277 are re-attached collectively hereto as Exhibit "B" and are incorporated by reference as if fully set forth herein.]

      b.   **STEM 6322:** On or about April 22, 2013, Cosulich paid Bunkering the amount of $1,600,000.00 under stem number 6322 in partial payment of Bunkering invoice 130416-1for the purchase of a portion (12,598.425 bbls) of a total of 23,500 barrels of Number 2 diesel fuel. Cosulich issued its Pro Forma invoice dated May 29, 2013, to Bunkering and/or BTU in the amount of $1,616,377.93 on that purchase. On or about May 21, 2013, Cosulich made its second payment to Bunkering under stem number 6322 in the amount of $1,384,500.00 in full payment of Bunkering invoice 130416-1for the purchase of the remaining 10,901.574 barrels of Number 2 diesel fuel. On May 29, 2013, Cosulich submitted its Pro Forma invoice to Bunkering and/or BTU on the second remittance in the amount of $1,398,671.94. Thereafter, the following set of rolled over invoices was issued by Cosulich to Bunkering and/or BTU:

      1)   Pro Forma invoice 6322 dated April 22 for $1,632,775.88 (60 days for 12.5k bbls);

2)     Pro Forma invoice 6322 dated July 10 for $1,412,843.99 (60 days for 10.9k bbls);

3)     Pro Forma invoice 6322 dated April 22 for $1,665,511.78 (120 days for 12.5k bbls);

4)     Pro Forma invoice 6322 dated July 25 for $1,427,016.04 (90 days for 10.9k bbls).

The total owed by Bunkering and/or BTU on stem number 6322 is **$3,092,527.82**, plus interest. [Bunkering/BTU and Cosulich invoices pertaining to stem 6322 are attached collectively hereto as Exhibit "A" and are incorporated by reference as if fully set forth herein.]

30.    The grand total owed to Cosulich by Bunkering and/or BTU (stems 6322 + 6277) = **$4,625,117.52,** plus interest.

31.    The issuance of each invoice and each request to roll over the indebtedness, made by or on behalf of Bunkering, BTU, and/or Brito (or those acting with his full authority), was each itself an express and overt act of fraud on Cosulich, representing and implying a present ability to pay which did not exist and was false. Because of its ongoing close and insider relationship with Bunkering, BTU and Brito as alleged above, BI knew or should have known of this falsity and was under a duty to advise Cosulich accordingly, which it did not do.

32. On April 29, 2013, Brito filed a Motion for Judicial Dissolution as to Bunkering in the litigation based on allegations of financial misconduct, misappropriation and waste allegedly perpetrated by Cleveland. Based upon the close, insider position that BI held with Bunkering and BTU, and its close relationship with Brito, as well as it duties to engage in due diligence, BI knew or should have known of this filing and/or Bunkering and/or Brito's efforts to dissolve the LLC.

33. At no time while the two stems at issue were entered into, or were being rolled over, did Bunkering, BTU, BI, Brito, or Pappaceno, advise Cosulich that Brito was either contemplating, or actively seeking through court action, a dissolution of Bunkering based largely on the representation made in pleadings by Brito that there were "insufficient assets or inventory on hand that can be sold for cash to pay off all the creditors of the Company..." – in short, that Bunkering was *insolvent*.

34. The Motion for Judicial Dissolution was filed *before* Cosulich made the second of two payments to Bunkering and/or BTU on stem 6322 on May 21, 2013, in the amount of $1,384,500.00. Had Cosulich known that Bunkering and/or Brito had filed a Motion for Judicial Dissolution based upon insolvency grounds (among other grounds), or if Bunkering, BTU, Brito, BI, or any of their agents,

simply informed Cosulich of Bunkering's insolvency position at the time the Motion was filed, Cosulich would not have made the second payment on stem 6322 and would have taken steps to demand full, immediate payments from Bunkering, BTU and Brito as to prior payments, and/or otherwise taken steps to secure raw materials or product to protect its interest in same, among other actions, including filing suit and seeking injunctive relief.

35. Bunkering, BTU, and Brito and, BI suppressed and concealed Brito's efforts to dissolve Bunkering, as well as Brito's belief that Bunkering was insolvent, from Cosulich and led Cosulich to believe that it was "business as usual" so that Cosulich would continue to roll over the indebtedness, do business with Bunkering, BTU and Brito, and not take steps to protect its interests.

36. While the undisclosed Motion requesting judicial dissolution was pending in May 2013, representatives of Cosulich were invited to Mobile to meet again with Bunkering, BTU and Brito to discuss an expanded financial role for Cosulich in Bunkering and/or BTU's joint business ventures which BI, through Pappaceno, acting as Cosulich's exclusive broker, was soliciting and promoting.

37. When the meeting in Mobile was first proposed in or about March 2013, Cosulich was informed that BI would be in attendance; however, BI withdrew from the meeting in Mobile, and began for the first time to allow direct

communication by Cosulich with Bunkering, BTU and Brito. A reasonable inference from BI's withdrawal from the meeting is that BI knew and understood the precarious and worsening financial condition of Bunkering and/or BTU and was beginning to distance itself from these entities.

38. On May 9, 2013, Cosulich representatives traveled to Orlando, Florida, and met with representatives of BI, namely, CEO John Canal, and Pappaceno. During these meetings, BI gave no hint or indication, much less disclose, that litigation between Bunkering's management was on-going; that Brito was seeking judicial dissolution of Bunkering in the litigation; that Cleveland was alleged to have misappropriated Bunkering's funds or wasted company assets; that Bunkering and/or BTU's financial position was worsening; or, that Bunkering was insolvent.

39. Also present at BI offices on May 9, 2013, was Bunkering, BTU and Brito agent, employee, and officer, Sarah Shipman Myers, further evidencing and solidifying the appearance of a close working relationship between BI, Bunkering, BTU and Brito. On this occasion, Shipman Meyers did not make any disclosure of the on-going litigation, the motion for judicial dissolution of Bunkering, that Bunkering was unable to pay its debts as represented by court pleadings or of Bunkering or BTU's worsening financial condition(s) or Bunkering's insolvency to

Cosulich's representatives.

40.    After the meeting in Orlando, Florida, these same Cosulich representatives traveled to Mobile, Alabama, where they met with Bunkering, BTU, Brito, and other agents, servants, and employees of same, including Shipman Myers, to discuss on-going and prospective business opportunities.

41.    The meeting was held on May 10, 2013, at the offices of Bunkering and BTU on St. Emanuel Street in Mobile and was attended by Brito, Shipman Myers, and other agents of Bunkering, BTU and Brito.

42.    During this meeting, Bunkering, BTU, Brito, and their agents, including Shipman Myers, despite the fact that Brito had filed a Motion to judicially dissolve Bunkering, expressly represented that Bunkering and BTU were viable and financially sound business entities, that both business entities continued to be profitably engaged in their historical business pursuits, and otherwise provided express assurances by conduct, words and silence that it was not only "business as usual," but that Bunkering and BTU were financially sound enough to expand business opportunities with Cosulich, which was being actively promoted and marketed in these meetings. In so doing, BTU and Brito, including their agents, servants and employees, expressly misrepresented the true financial condition of Bunkering and/or BTU and suppressed and concealed the true, dire

status of Bunkering's business operations and financial condition from Cosulich.

43.     All joint and several representations by Bunkering and BTU (through their agents (including Brito, Shipman Myers, and others), BI (through Pappaceno and others), and/or Brito (and those acting on his behalf including Shipman Myers), jointly or severally, to the effect that Bunkering was a viable and profitable business enterprise seeking joint business pursuits and opportunities with Cosulich, particularly those made after April 29, 2013, the date Brito filed his Motion for Judicial Dissolution, constitute affirmative misrepresentations, fraud, deceit and suppression within the meaning of Alabama Code Sections 6-5-100 *et seq.*, **Code of Alabama** (1975).

44.     In May 2013, Bunkering and BTU were financially obligated to Cosulich for approximately $6 million dollars.

45.     Bunkering and BTU, through Brito, and others working under him, and Cosulich's exclusive broker and agent, BI, through Pappaceno, requested that Cosulich "roll over" the indebtedness owed by Bunkering and BTU to Cosulich as the indebtedness came due, which Cosulich did as a result of not being informed of the true facts regarding "Specialty's" adverse and worsening financial position.

46.     On or about July 19, 2013, Brito filed an affidavit executed by him in support of his April 29, 2013, Motion for Judicial Dissolution of Bunkering, in

which he testified that "Specialty [i.e., Bunkering] now is operating at a negative equity position... its liabilities exceed its assets....Specialty has no cash reserves, no available credit on terms that are viable to the continued operation of the business and thus has no way to operate as it has operated in the past." None of that information was provided to Cosulich during any meeting with Bunkering, BTU, BI, Brito and Pappaceno. A true and correct copy of the Brito Affidavit as filed in the litigation is attached hereto as Exhibit "D", and is incorporated by reference as if fully set forth herein.

47. The insolvency of Bunkering has now been made manifest by its Chapter 7 bankruptcy filing as noted, *supra*.

48. Cosulich made written demand on Bunkering and BTU for payment before the Original Complaint in this case was filed. Despite repeated demands by Cosulich, Bunkering and BTU did not and have not remitted payment to Cosulich or otherwise provided adequate assurances or security for same.

49. Bunkering, BTU and/or Brito issued or caused to be issued a "Warehouse Receipt" to Cosulich to lead Cosulich to believe that Cosulich had and maintained a right to possess the product at issue as security for the debt evidenced by the invoices. See "Warehouse Receipt" dated April 8, 2013, attached to the Original Complaint as Exhibit "C" and incorporated by reference as if fully set

forth herein. The "Warehouse Receipt" was false, bogus and is direct evidence of an express misrepresentation by Bunkering, BTU and Brito, and those acting on their behalf.

50. The fuel-based product in question was capable of being conveyed, sold and physically transferred and/or "consumed" or otherwise placed beyond the jurisdiction of this Court and the ability of Cosulich to adequately secure its collateral as security for payment on the debts. As a proximate consequence of the concealment of Bunkering and BTU's insolvency, and the express misrepresentation of the "Warehouse Receipt", Cosulich did not take steps to secure such fuel-based product collateral and, on information and belief, any such product has now been sold, transferred, misappropriated or wasted by Bunkering, BTU, Brito and/or those working under their control, if indeed it ever existed.

## Count One
## (Breach of Contract/Account Stated)

51. Cosulich adopts and realleges the allegations contained in paragraphs 2, 3, 8, 13, and 27 through 29 of this Third Amended Complaint as if fully set forth herein.

52. Cosulich claims of the Defendant, BTU under stem 6322, the sum of **$3,092,527.82**, together with interest thereon for breach of contract or stated account.

WHEREFORE, premises considered, Fratelli Cosulich Unipessoal, S.A. (formerly known as "Fratelli Cosulich Consultadoria E Participacoes Unipessoal, LDA"), demands judgment against the Defendant, Specialty Fuels BTU, LLC, in the amount of **$3,092,527.82**, plus interest and costs of Court.

## Count Two
## (Breach of Contract/Account Stated)

53.     Cosulich adopts and realleges the allegations contained in paragraphs 2, 3, 8, 13, and 27 through 29 of this Third Amended Complaint as if fully set forth herein.

54.     Cosulich claims of the Defendant(s), BTU, under stem 6277, the sum of **$1,532,589.70**, together with interest thereon for breach of contract or stated account.

WHEREFORE, premises considered, Fratelli Cosulich Unipessoal, S.A. (formerly known as "Fratelli Cosulich Consultadoria E Participacoes Unipessoal, LDA"), demands judgment against the Defendant, Specialty Fuels BTU, LLC, in the amount of **$1,532,589.70**, plus interest and costs of Court.

## Count Three
## (Fraud/Misrepresentation)

55.     Cosulich refers to the factual allegations of paragraphs 1 through 50

for context; specifically adopts and alleges the allegations of paragraphs 5, 8 through 39, 43, and 45 through 46 as to BI; adopts and alleges paragraphs 2, through 4, 8 through 10, 13, 14, 22 through 24, 26 through 37, 39 through 50 as to BTU and Brito; and alleges as to all Defendants the following:

56. At all times material to this Third Amended Complaint and, specifically during the time period 2011 to April 2013, BI acted as the exclusive broker and agent for Cosulich involving numerous transactions with Bunkering and BTU as recited above. As a result of this exclusive broker and agency relationship, BI owed certain duties of care traditionally recognized and created by this relationship.

57. BI expressly vouched for and represented Bunkering, BTU and Brito as being financially sound and trustworthy by approaching Cosulich to induce Cosulich to do business with them:

    a.    On May 16, 2012, the month that the Baldwin County litigation was filed, Pappaceno reassured Cosulich's representative in an IM that "he" (meaning Brito/"Specialty") would pay by stating, "Don't worry."

    b.    On May 22, 2012, when Cosulich's representative complained that "[T]hey [Specialty] keep ignoring us", Pappaceno, on

behalf of BI, excused and defended the behavior stating, "He is not ignoring us…Just hasn't got back yet", and promised to call "him" in "10-15 minutes." Pappaceno later sent an IM to Cosulich letting Cosulich know that he had spoken to Specialty. He did not advise Cosulich of any problems with Specialty's management, leading Cosulich to believe that all was normal.

c.  On June 14 and June 25, 2012, Cosulich inquired through IM communications as to payment status on a pending transaction from "Specialty". Pappaceno responded and, again, did not inform Cosulich of litigation involving "Specialty's" management or that Bunkering and Brito were contending by formal pleadings that the litigation was adversely impacting their ability to transact business, including business with BI as stated in their pleadings.

d.  In August 2012, there were further IM communications between BI, through Pappaceno, and Cosulich regarding "Specialty's" payment status on pending transactions. Cosulich indicated that it was in a position to fund approximately $2-2.5 million on another transaction. Pappaceno, inquiring and

receiving assurances that Cosulich would pay BI's commissions (which it did), did not inform Cosulich of litigation involving "Specialty's" management or that Bunkering and Brito were contending by formal pleadings that the litigation was adversely impacting their ability to transact business, including business with BI.

e. On October 9, 2012, BI, through Pappaceno, directly solicited a $2 million deal from Cosulich stating, "I need closer to 2. for a specialty deal…Bunkers intl. (sic) does not need it (sic) anything. Let me know if you can do 2 and … Don't forget thye (sic) have 2 due next week that we will pay."

f. At no point during the time frame leading up to and including the two stems at issue in this case did BI or Pappaceno inform Cosulich of on-going litigation involving "Specialty's" management or that Bunkering and Brito were contending by formal pleadings that the litigation was adversely impacting their ability to transact business, including business with BI.

g. Stem 6277 was transacted on January 11, 2013, through Pappaceno and BI serving as Cosulich's broker and the sole

intermediary between Cosulich and "Specialty" as established by customary practices insisted upon by Pappaceno and BI. Cosulich paid $2,828,322 to "Specialty". Had Cosulich known of "Specialty's" adverse financial condition arising from the on-going litigation, it would not have provided those funds.

h.  On January 29, 2013, Pappaceno sent an IM to Cosulich's representative soliciting another $1.5 million payment by Cosulich to "Specialty". By the act of soliciting this transaction from Cosulich, Pappaceno and BI impliedly vouched for and directly misrepresented "Specialty's" present financial ability to perform on the transaction.

i.  On February 6, 2013, Pappaceno represented to Cosulich in an IM that, "After speaking with Specialty, they should have your invoice paid within 10 business days. Hopefully sooner." Pappaceno further represented as to Specialty, "**Business is good**". (Emphasis added.) By his actions and on-going communications with Cosulich, and by not informing Cosulich of on-going litigation involving "Specialty" management or that Bunkering, BTU and Brito were

experiencing adverse financial conditions which negatively impacted their ability to transact business and perform on its financial obligations, BI and Pappaceno vouched for and directly misrepresented "Specialty's" present financial ability to perform on the transaction.

j.   In April 2013, the very month that Bunkering filed its Motion for Judicial Dissolution in the Baldwin County litigation, BI and Pappaceno suddenly backed away from the insistence that Cosulich only deal with "Specialty" through them and permitted a direct transaction between "Specialty" and Cosulich.

k.   Nevertheless, Pappaceno and BI remained involved. On April 11, 2013, Pappaceno posted an IM to Cosulich in which he proposed that Cosulich "buy the 16500k bbls...and then collect your outstanding...Refreshes the accounts...**gives you title to fuel**" (Emphasis added.)

l.   This representation was made three (3) days after Cosulich received a false, bogus and materially misleading "Warehouse Receipt" from "Specialty" via email on which Pappaceno was

copied. This "Warehouse Receipt" was a direct
misrepresentation by BTU and Brito, through their
authorized representatives, that Cosulich's outstanding accounts
were secured by product when, in fact, they were not. Not
knowing that the "Warehouse Receipt" was fraudulent,
Cosulich relied upon it and took no further steps to protect its
interests.

m.     By the act of soliciting the April 11 transaction from Cosulich,
Pappaceno and BI vouched for and misrepresented
"Specialty's" present financial ability to perform on the
transaction.  Ultimately, this solicitation resulted in stem 6322
and a payment by Cosulich to "Specialty" in the total amount of
$2,984,500, exclusive of interest. Had Cosulich known of
"Specialty's" adverse financial condition arising from the on-
going litigation, or that Bunkering had filed a Motion for
Judicial Dissolution in the Circuit Court of Baldwin
County, it would not have relied on Pappaceno and BI's
representations and would not have provided those funds.

58.   BI knew or should have known, acting through its duly authorized

agents, servants and employees, including Pappaceno, that Cosulich was relying on BI to exercise all reasonable care and skill commensurate with its duties and to reasonably inform Cosulich of any information which would indicate that Bunkering and/or BTU were not financially sound and to not provide false or misleading information regarding the financial condition of those entities.

59. In addition, the facts demonstrate the existence of a "special relationship" which imposed a duty on the part of BI to not misrepresent the facts or mislead Cosulich and to disclose material information regarding the financial viability of Bunkering and BTU. Those facts supporting the existence of this duty include, but are not limited to, the following:

a. On February 2, 2012, Pappaceno posted an IM to Cosulich [involving an issue of whether Cosulich received funds from another entity, "Plaza" which were to be used to pay a "Specialty" invoice] in which he expressly stated to Cosulich's representative that "**You can trust me**". (Emphasis added.);

b. On May 15, 2012, Cosulich posted an IM to Pappaceno concerning "Specialty's" tardiness on performing on a pending transaction. On May 16, 2012, BI, through Pappaceno, responded to the prior IM stating that he, "Spoke with

Specialty late yday (sic)…He [presumably Brito] is not able to pay anything this week…**Don't worry**." (Emphasis added.);

c.    BI made it known to Cosulich that it had acted as a factor for Bunkering and/or BTU in the past and, in fact, purchased Bunkering's invoices from Cosulich on at least two occasions in 2010, such that BI paid Cosulich's invoices to Bunkering as part of its factoring arrangement;

d.    BI made it known to Cosulich that it also bought and sold fuel oil and fuel oil by-products, as a principal on extended credit terms with Bunkering and BTU (including in some instances participation in the same transactions that Cosulich had committed to with Bunkering and BTU), thereby vouching for Bunkering and BTU's reliability as a financially sound and responsible business entity in further support and solicitation of Cosulich doing business with those entities;

e.    BI's employee and agent, Pappaceno, informed Cosulich that he had invested his personal funds in Bunkering and/or BTU;

f.    BI caused Cosulich to believe that all funds provided by Cosulich to "Specialty" were tied to and secured by a product

or cargo;

g. Pappaceno and BI insisted that Cosulich not contact "Specialty" directly and required Cosulich to use BI as the sole intermediary between the parties. This required Cosulich to become dependent and reliant on BI for all current and accurate information pertaining to "Specialty's" financial ability *vel non* to perform on the transactions.

60. At all times material, BI, BTU, and Brito (acting either individually or by and through others with his authority), misrepresented the true financial condition of Bunkering and BTU by representing that Bunkering and BTU were solvent business entities and that each was financially healthy enough to do business with Cosulich when in fact they were not. By these misrepresentations, BI, BTU and Brito induced Cosulich to provide credit terms exceeding several millions of dollars and to roll over that indebtedness as aforesaid.

61. Additionally, Bunkering, BTU and Brito (acting either individually or by and through others with his authority), in a further successful effort to fraudulently induce Cosulich to provide credit terms exceeding millions of dollars, and to roll over any such indebtedness, gave Cosulich a false and bogus "Warehouse Receipt (attached to the Original Complaint as Exhibit "C") which

indicated that the money provided by Cosulich was secured thereby giving Cosulich a false sense of security concerning the money it had provided and further induced Cosulich not to act. The "Warehouse Receipt" is direct evidence of misrepresentation on the part of BTU, and Brito, among others.

62. BTU and Brito were motivated by, and directly benefitted from, the fraud perpetrated upon Cosulich by receipt of millions of dollars in credit terms, the rolling over of indebtedness and the forbearance of action by Cosulich on the said indebtedness.

63. In return for Cosulich's reliance on Pappaceno's and BI's representations and efforts as aforesaid, BI was able to secure millions of dollars worth of extended credit from Cosulich for Bunkering and BTU and secure brokerage commissions for itself. In addition, BI may have also lessened direct financial risk to itself for any credit which it may have extended to Bunkering and BTU during the same time period by securing for Bunkering and BTU the ability to perform debt service to it (BI) through receipt of funds provided by Cosulich.

64. At all times material to this Amended Complaint, BTU, BI, and Brito, jointly and separately, in violation of §§6-5-101 & 103 **Code of Alabama** (1975), based on the facts as alleged, acted willfully and intentionally to deceive, and/or recklessly, negligently and/or wantonly misrepresented (a) the true state of the

financial condition of Bunkering and BTU and (b) the status of fuel based product serving as security or collateral to Cosulich so that Cosulich, being ignorant of the true facts through no fault of its own, would continue to engage in significant business transactions with Bunkering and BTU and not take steps to protect its interests.

65.     Cosulich relied upon the willful, intentional, reckless, negligent and/or wanton misrepresentations and undisclosed fraudulent conduct of BTU, BI, and Brito and engaged in business transactions with "Specialty" (Bunkering and BTU), through its exclusive broker and agent, BI, by transacting millions of dollars in sales toward their business enterprise, purchasing millions of dollars worth of product, rolling over Bunkering and BTU's indebtedness to it, and otherwise forbearing action to perfect liens, file suit, take title or secure the fuel based product to serve as collateral for the funds provided to Bunkering and/or BTU which it otherwise would have done.

66.     As a proximate result of the violation(s) of §§6-5-101 & 103 **Code of Alabama** (1975) and the willful, intentional, reckless, negligent and/or wanton misrepresentations and undisclosed fraudulent conduct of BTU, BI, and Brito, Cosulich has been damaged in the amount of **$4,625,117.52**, plus interest.

67.     At all times material, BTU, Brito, and BI, by and through their

agents, servants and employees, acted with a reckless and conscious disregard for the rights of Cosulich such that they were wanton, making an award of punitive damages warranted under the facts and circumstances.

WHEREFORE, premises considered, Fratelli Cosulich Unipessoal, S.A. (formerly known as "Fratelli Cosulich Consultadoria E Participacoes Unipessoal, LDA"), demands judgment against the Defendants, Specialty Fuels BTU, LLC, Bunkers International Corporation, and Javier Brito, jointly and separately, for compensatory damages in the amount of **$4,625,117.52**, plus interest, punitive damages as may be determined by the jury, and costs of Court.

## Count Four
## (Suppression)

68.     Cosulich refers to the factual allegations of paragraphs 1 through 50 for context; specifically adopts and alleges the allegations of paragraphs 5, 8 through 39, 43, and 45 through 46 as to BI; adopts and alleges paragraphs 2, through 4, 8 through 10, 13, 14, 22 through 24, 26 through 37, 39 through 50 as to BTU and Brito; and alleges as to all Defendants the following:

69.     At all times material, BI (as Cosulich's exclusive broker and agent, and as sole intermediary between Cosulich, Bunkering and BTU) and Bunkering and BTU had a duty to disclose, advise, protect and/or act with reasonable care in notifying and disseminating material information to Cosulich concerning

"Specialty's" management dispute/litigation, "Specialty's" financial difficulties, and, specifically, the inability of Bunkering and BTU to engage in the ordinary course of business in their dealings with Cosulich. Rather than disclose the serious financial consequences developing from the management dispute and litigation (which was putting Bunkering in dire financial condition and severely jeopardizing its ability not only to meet its ongoing financial obligations at that time, but also to conduct business generally in the future), Bunkering, BTU, Brito and BI, through Pappaceno and others, either intentionally or through lack of due care, and in breach of their joint and several duties and responsibilities to Cosulich, kept Cosulich uninformed and "in the dark", thereby continuing to lead Cosulich to falsely believe that Bunkering and/or BTU were solvent business entities, financially healthy enough engage in normal business operations and to service their financial obligations to Cosulich, to be considering expansion, and that Bunkering's operations were "business as usual".

70. By their conduct, representations, assurances and silence, Bunkering, BTU, Brito and BI, acting through Pappaceno and others, concealed the true financial state of affairs from Cosulich so as to lead Cosulich into a false sense of their business affairs (and security) and to induce Cosulich to continue to do business with Bunkering and/or BTU by providing millions of dollars in funds to

them or otherwise agreeing to "roll over" their outstanding financial obligations to Cosulich.

71. Relying on the conduct, information and assurances of Bunkering, BTU and BI, and because of the trust and special relationship created by BI as its exclusive broker and agent based upon facts as alleged above and below, Cosulich continued to do business with Bunkering and BTU, through its exclusive broker and agent, BI, to its ultimate financial detriment. Had Cosulich been informed of the true state of Bunkering's business and financial affairs it would not have done so, and stems 6277 and 6322, described below, would not have been made.

72. At all times material to this Third Amended Complaint, based upon the course of conduct established over years between BI and Cosulich, a "special relationship" requiring disclosure of material facts to Cosulich was created. The facts evidencing the creation of the special relationship are, among others, as follows:

   a. On February 2, 2012, Pappaceno posted an "instant message" ("IM") to Cosulich [involving an issue of whether Cosulich received funds from another entity, "Plaza" which were to be used to pay a "Specialty" invoice] in which he expressly stated to Cosulich's representative that "**You can trust me**".

(Emphasis added.);

b.    On May 15, 2012, Cosulich posted an IM to Pappaceno concerning "Specialty's" tardiness on performing on a pending transaction. On May 16, 2012, BI, through Pappaceno, responded to the prior IM stating, at times, that he, "Spoke with Specialty late yday (sic)…He [presumably Brito] is not able to pay anything this week…**Don't worry**." (Emphasis added.);

c.    BI made it known to Cosulich that it had acted as a factor for Bunkering and/or BTU in the past and, in fact, purchased Bunkering's invoices from Cosulich on at least two occasions in 2010, such that BI paid "Specialty's" financial obligations to Cosulich as part of its factoring arrangement;

d.    BI made it known to Cosulich that it also bought and sold fuel oil and fuel oil by-products, as a principal on extended credit terms with Bunkering and BTU (including in some instances participation in the same transactions that Cosulich had committed to with Bunkering and BTU), thereby vouching for Bunkering and BTU's reliability as a financially sound and

responsible business entity in further support and solicitation of Cosulich doing business with those entities;

e.　BI's employee and agent, Pappaceno, informed Cosulich that he had invested his personal funds in Bunkering and/or BTU;

f.　BI caused Cosulich to believe that all funds provided by Cosulich to "Specialty" were tied to and secured by a product or cargo.

g.　Pappaceno and BI insisted that Cosulich not contact "Specialty" directly and required Cosulich to use BI as the sole intermediary between the parties. This required Cosulich to become dependent and reliant on BI for all current and accurate information pertaining to "Specialty's" financial ability *vel non* to perform on the transactions.

73. BTU, Brito and BI knew or should have known that Cosulich was relying on each of them, jointly and separately, to provide and disclose accurate and truthful information concerning Bunkering, BTU, and Brito's ability to pay the indebtedness at the time the obligations were created. BTU, Brito and BI all breached their duties to Cosulich by not disclosing the true financial condition of Bunkering and BTU.

74. At all times material to this Third Amended Complaint, BTU, BI, and Brito, jointly and separately, negligently and/or wantonly or with an intent to deceive, engaged in activities and conduct as aforesaid to conceal and suppress material facts from Cosulich, in violation of §6-5-102 **Code of Alabama** (1975), which they had a duty to disclose, jointly and separately, at all times as to (a) the true state of the financial condition of Bunkering and BTU and (b) the status of fuel based product serving as security or collateral so that Cosulich, being ignorant of the true facts (through no fault of its own), would continue to engage in significant business transactions with Bunkering and BTU and not take steps to protect its interests.

75. Cosulich relied upon the concealment and suppression of material facts, as described, and engaged in business transactions with Bunkering and BTU, through its exclusive broker and agent, BI, by not being informed of the true facts as they related to Bunkering and/or BTU and extending millions of dollars in funds toward their business enterprise, purchasing millions of dollars worth of product, rolling over Bunkering and BTU's indebtedness to it, and otherwise causing Cosulich to delay efforts to perfect liens, file suit, take title or otherwise secure the fuel based product to serve as collateral for the funds provided to Bunkering and/or BTU.

76. As a proximate result of BTU, Brito and BI's joint and several conduct as aforesaid in violation of §6-5-102 **Code of Alabama** (1975), Cosulich has been damaged in the amount of **$4,625,117.52**, plus interest.

77. At all times material, BTU, Brito, and BI, by and through their agents, servants and employees, acted with a reckless and conscious disregard for the rights of Cosulich such that they were wanton, making an award of punitive damages warranted under the facts and circumstances.

WHEREFORE, premises considered, Fratelli Cosulich Unipessoal, S.A. (formerly known as "Fratelli Cosulich Consultadoria E Participacoes Unipessoal, LDA"), demands judgment against the Defendants, Specialty Fuels BTU, LLC, Bunkers International Corporation, and Javier Brito, jointly and separately, for compensatory damages in the amount of **$4,625,117.52**, plus prejudgment interest, punitive damages as may be determined by the jury, and costs of Court.

## Count Five
## (Deceit)

78. Cosulich refers to the factual allegations of paragraphs 1 through 50 for context; specifically adopts and alleges the allegations of paragraphs 5, 8 through 39, 43, and 45 through 46 as to BI; adopts and alleges paragraphs 2, through 4, 8 through 10, 13, 14, 22 through 24, 26 through 37, 39 through 50 as to BTU and Brito; and alleges as to all Defendants the following:

79. BI (as Cosulich's exclusive broker and agent, and as sole intermediary between Cosulich, Bunkering and BTU) and Bunkering and BTU had a duty to disclose, advise, protect and/or act with reasonable care in notifying and disseminating this material information to Cosulich concerning the management dispute/litigation, "Specialty's" financial difficulties, and, specifically, the inability of Bunkering and BTU to engage in the ordinary course of business in their dealings with Cosulich.

80. Rather than disclose the serious financial consequences developing from the management dispute and litigation (which was putting Bunkering in dire financial condition and severely jeopardizing its ability not only to meet its ongoing financial obligations at that time, but also to conduct business generally in the future), Bunkering, BTU, Brito and, on information and belief, BI, through Pappaceno and others, either intentionally or through lack of due care, and in breach of their joint and several duties and responsibilities to Cosulich, kept Cosulich uninformed and "in the dark", thereby continuing to lead Cosulich to falsely believe that Bunkering and/or BTU were solvent business entities, financially healthy enough to be considering expansion, and that Bunkering's operations were "business as usual".

81. By their conduct, representations, assurances and silence, Bunkering,

BTU, Brito and BI, acting through Pappaceno and others, concealed the true financial state of affairs from Cosulich so as to lead Cosulich into a false sense of their business affairs (and security) and to induce Cosulich to continue to do business with Bunkering and/or BTU by providing millions of dollars in funds to them or otherwise agreeing to "roll over" their outstanding financial obligations to Cosulich.

82. Relying on the conduct, information, assurances and silence of Bunkering, BTU and BI, and particularly through the trust and special relationship created by BI as its exclusive broker and agent, Cosulich continued to do business with Bunkering and BTU, through its exclusive broker and agent, BI, to its ultimate financial detriment. Had Cosulich been informed of the true state of Bunkering's business and financial affairs it would not have done so, and stems 6277 and 6322, described below, would not have been made.

83. At all times material to this Third Amended Complaint, based upon the course of conduct established over years between BI and Cosulich based upon facts as alleged above and below, a "special relationship" requiring disclosure of material facts by BI to Cosulich was created. The facts evidencing the creation of the special relationship are, among others, as follows:

      a.     On February 2, 2012, Pappaceno posted an "instant message"

("IM") to Cosulich [involving an issue of whether Cosulich received funds from another entity, "Plaza" which were to be used to pay a "Specialty" invoice] in which he expressly stated to Cosulich's representative that "**You can trust me**". (Emphasis added.);

b.   On May 15, 2012, Cosulich posted an IM to Pappaceno concerning "Specialty's" tardiness on performing on a pending transaction. On May 16, 2012, BI, through Pappaceno, responded to the prior IM stating, at times, that he, "Spoke with Specialty late yday (sic)…He [presumably Brito] is not able to pay anything this week…**Don't worry**." (Emphasis added.);

c.   BI made it known to Cosulich that it had acted as a factor for Bunkering and/or BTU in the past and, in fact, purchased Bunkering's invoices from Cosulich on at least two occasions in 2010, such that BI paid "Specialty's" financial obligations to Cosulich as part of its factoring arrangement;

d.   BI made it known to Cosulich that it also bought and sold fuel oil and fuel oil by-products, as a principal on extended credit

terms with Bunkering and BTU (including in some instances participation in the same transactions that Cosulich had committed to with Bunkering and BTU), thereby vouching for Bunkering and BTU's reliability as a financially sound and responsible business entity in further support and solicitation of Cosulich doing business with those entities;

e.  BI's employee and agent, Pappaceno, informed Cosulich that he had invested his personal funds in Bunkering and/or BTU;

f.  BI caused Cosulich to believe that all funds provided by Cosulich to "Specialty" were tied to and secured by a product or cargo.

g.  Pappaceno and BI insisted that Cosulich not contact "Specialty" directly and required Cosulich to use BI as the sole intermediary between the parties. This required Cosulich to become dependent and reliant on BI for all current and accurate information pertaining to "Specialty's" financial ability *vel non* to perform on the transactions.

84. BTU, Brito and BI knew or should have known that Cosulich was relying on each of them, jointly and separately, to provide and disclose accurate

and truthful information concerning Bunkering, BTU, and Brito's ability to repay the indebtedness at the time the obligations were created. BTU, Brito and BI all breached their duties to Cosulich by not disclosing the true financial condition of Bunkering and BTU.

85. At all times material to this Amended Complaint, BTU, BI, and Brito, jointly and separately, in violation of §6-5-104 **Code of Alabama** (1975), negligently/wantonly and/or willfully deceived Cosulich with an intent to induce injury or risk and/or negligently, recklessly and/or intentionally misrepresented by their course of conduct, words, silence and dealings with Cosulich as aforesaid (a) the true state of the financial condition of Bunkering and BTU and (b) the status of fuel based product serving as security or collateral to Cosulich so that Cosulich, being ignorant of the true facts (through no fault of its own), would continue to engage in significant business transactions with Bunkering and BTU and to induce forbearance from Cosulich to act to protect its interests.

86. Cosulich reasonably relied to its detriment upon the negligent and/or wanton and/or willful deceit, and/or negligent, reckless and/or intentional misrepresentations, undisclosed fraudulent conduct and schemes of BTU, BI, and Brito, acting jointly and separately. Cosulich was in fact deceived and engaged in business transactions with Bunkering and BTU, through its exclusive broker and

agent, BI, by extending millions of dollars in funds toward their business enterprise, purchasing millions of dollars worth of product, rolling over Bunkering and BTU's indebtedness to it, and otherwise causing Cosulich to delay efforts to perfect liens, file suit, take title or otherwise secure the fuel based product to serve as collateral for the funds provided to Bunkering and/or BTU.

87.    As a proximate result of BTU, BI, and Brito's joint and several violation of §6-5-104 **Code of Alabama** (1975) as alleged, Cosulich has been damaged in the amount of **$4,625,117.52**, plus interest.

88.    At all times material, BTU, Brito, and BI, by and through their agents, servants and employees, acted with a reckless and conscious disregard for the rights of Cosulich such that they were wanton, making an award of punitive damages warranted under the facts and circumstances.

WHEREFORE, premises considered, Fratelli Cosulich Unipessoal, S.A. (formerly known as "Fratelli Cosulich Consultadoria E Participacoes Unipessoal, LDA"), demands judgment against the Defendants, Specialty Fuels BTU, LLC, Bunkers International Corporation, and Javier Brito, jointly and separately, for compensatory damages in the amount of **$4,625,117.52**, plus interest, punitive damages as may be determined by the jury, and costs of Court.

## Count Six
## (Fraud in the Inducement)

89. Cosulich refers to the factual allegations of paragraphs 1 through 50 for context; specifically adopts and alleges the allegations of paragraphs 5, 8 through 39, 43, and 45 through 46 as to BI; adopts and alleges paragraphs 2, through 4, 8 through 10, 13, 14, 22 through 24, 26 through 37, 39 through 50 as to BTU and Brito; and alleges as to all Defendants the following:

90. At all times material to this Third Amended Complaint, BTU and/or Brito, and BI, as Cosulich's exclusive broker and agent, jointly and separately, negligently, wantonly, and/or recklessly engaged in activities and conduct as aforesaid which misrepresented and/or concealed or suppressed information which they each had a duty to disclose, jointly and separately, as to (a) the true state of the financial condition of Bunkering and BTU and (b) the status of fuel based product serving as security or collateral so that Cosulich, being ignorant of the true facts through no fault of its own, would continue to engage in significant business transactions with Bunkering and BTU and be induced not take steps to protect its interests.

91. Cosulich relied upon the joint and several undisclosed fraudulent conduct by BTU, BI, and Brito and engaged in business transactions with Bunkering, BTU, and Brito, through its exclusive broker and agent, BI, by extending millions of dollars in funds toward their business enterprise, purchasing

millions of dollars worth of product, rolling over Bunkering and BTU's indebtedness to it, and otherwise causing Cosulich to delay efforts to perfect liens, file suit, take title or otherwise secure the fuel based product to serve as collateral for the funds provided to Bunkering and BTU. From these transactions, BI obtained brokerage commissions and may have received an added benefit of having whatever credit it may have extended to Bunkering, BTU and/or Brito satisfied from the funds provided by Cosulich to those entities.

92. As a proximate result of the fraud perpetrated by BTU, Brito, and BI, jointly and separately, which induced Cosulich to act or forbear from acting, Cosulich was damaged in the amount of **$4,625,117.52**, plus interest.

93. At all times material, BTU, Brito, and BI, by and through their agents, servants and employees, acted with a reckless and conscious disregard for the rights of Cosulich such that they were wanton, making an award of punitive damages warranted under the facts and circumstances.

WHEREFORE, premises considered, Fratelli Cosulich Unipessoal, S.A. (formerly known as "Fratelli Cosulich Consultadoria E Participacoes Unipessoal, LDA"), demands judgment against the Defendants, Specialty Fuels BTU, LLC, Bunkers International Corporation, and Javier Brito, jointly and separately, for compensatory damages in the amount of **$4,625,117.52**, plus interest, punitive

damages as may be determined by the jury, and costs of Court.

## Count Seven
## (Fraud in Insolvency)

94.     Cosulich refers to the factual allegations of paragraphs 1 through 50 for context; specifically adopts and alleges the allegations of paragraphs 5, 8 through 39, 43, and 45 through 46 as to BI; adopts and alleges paragraphs 2, through 4, 8 through 10, 13, 14, 22 through 24, 26 through 37, 39 through 50 as to BTU and Brito; and alleges as to BTU and Brito the following:

95.     On May 29, 2012, Bunkering commenced litigation against Brito in the Circuit Court of Baldwin County, Alabama, in which other members of Bunkering sought, among other things, to wrest control of Bunkering from Brito. Brito, as a party, had actual knowledge of this litigation or should have known of it at the time of the July 2012 visit by representatives of Cosulich as described in paragraph 22, above.

96.     During this time, neither Brito, or any other representative of Bunkering or BTU, stated, indicated or otherwise made known to Cosulich that management of Bunkering, namely, Brito and Cleveland, was engaged in pitched litigation pending in the Circuit Court of Baldwin County, Alabama (hereinafter "litigation"), for control of Bunkering's business operations and that such was preventing Bunkering from being able to meet its financial obligations, including

financial obligations it owed to BI as its trading partner.

97.     Brito filed pleadings in June 2012 in that litigation, one month or less before the July 2012 visit by Cosulich, in which he represented, on behalf of himself and Bunkering, among other things, that because of the management dispute with Cleveland,

> a. Bunkering's financing sources, expressly including BI, were not being paid and that Bunkering's customers' ships or vessels were at risk of seizure by BI;
>
> b. Bunkering was losing the trust and good will of its customers thereby damaging Bunkering's ability to do business in the future;
>
> c. Bunkering's relationship with BI (a finance source) was being "irreparably damaged";
>
> d. Bunkering's ability to conduct business in general was being "irreparably damaged".

98.     On information and belief, the aforesaid financial difficulties created by the litigation continued and, in fact, worsened over time such that the ability of Bunkering and BTU to do business as normal became materially impaired.  Both entities were in a more precarious and worsening financial position and became increasingly unable over time leading up to and including January and April 2013

to perform on their financial obligations. This was unknown to Cosulich.

99.    On April 29, 2013, Brito filed a Motion for Judicial Dissolution as to Bunkering in the litigation based on allegations of financial misconduct, misappropriation and waste allegedly perpetrated by Cleveland. At no time while these two stems at issue were entered into, or were being rolled over, did Bunkering, BTU, BI, Brito, or Pappaceno, advise Cosulich that Brito was either contemplating, or actively seeking through court action, a dissolution of Bunkering based largely on the representation made in pleadings by Brito that there were "insufficient assets or inventory on hand that can be sold for cash to pay off all the creditors of the Company..." – in short, that Bunkering was *insolvent*.

100.  The Motion for Judicial Dissolution was filed *before* Cosulich made the second of two payments to Bunkering and/or BTU on stem 6322 on May 21, 2013, in the amount of $1,384,500.00.

101.  Had Cosulich known that Bunkering and/or Brito had filed a Motion for Judicial Dissolution based upon insolvency grounds (among other grounds), or if Bunkering, BTU, Brito, BI, or any of their agents, simply informed Cosulich of Bunkering's insolvency position at the time to Motion was filed, Cosulich would not have made the second payment on stem 6322 and would have taken steps to demand immediate payments from Bunkering, BTU and Brito as to prior

payments, and/or otherwise take steps to secure raw materials or product to protect its interest in same, among other actions including taking title, filing suit and seeking injunctive relief.

102. Rather than so informing Cosulich of Bunkering's insolvency position, BTU and Brito, and others acting on their behalf, suppressed and concealed Brito's efforts to dissolve Bunkering, as well as Brito's belief that Bunkering was insolvent, from Cosulich and led Cosulich to believe that it was "business as usual" so that Cosulich would continue to roll over the indebtedness, do business with Bunkering, BTU and Brito, and not take steps to protect its interests.

103. Notwithstanding the aforesaid Motion for Judicial Dissolution which was not disclosed to Cosulich, in May 2013, representatives of Cosulich were invited to Mobile to meet again with Bunkering, BTU and Brito to discuss an expanded financial role for Cosulich in Bunkering and/or BTU's joint business ventures which BI, through Pappaceno, acting as Cosulich's exclusive broker and agent, was soliciting and promoting.

104. On May 9, 2013, Cosulich representatives traveled to Orlando, Florida, and met with representatives of BI, namely, CEO John Canal and Pappaceno. Also present at BI offices on May 9, 2013, was Bunkering, BTU and

Brito agent, employee, and officer, Sarah Shipman Myers. On this occasion, Shipman Meyers did not make any disclosure of the on-going litigation, the motion for judicial dissolution of Bunkering, that Bunkering was unable to pay its debts as represented by court pleadings or of Bunkering or BTU's worsening financial condition(s) to Cosulich's representatives.

105. After the meeting in Orlando, Florida, these same Cosulich representatives traveled to Mobile, Alabama, where they met with Bunkering, BTU, Brito, and other agents, servants, and employees of same, including Shipman Myers, to discuss on-going and prospective business opportunities.

106. The meeting was held on May 10, 2013, at the offices of Bunkering and BTU on St. Emanuel Street in Mobile and was attended by Brito, Shipman Myers, and other agents of Bunkering, BTU and Brito. During this meeting, Bunkering, BTU, Brito, and their agents, including Shipman Myers, despite the fact that Brito had filed a motion to judicially dissolve Bunkering, expressly represented that Bunkering and BTU were viable and financially sound business entities, that both business entities continued to be profitably engaged in their historical business pursuits, and otherwise provided express assurances by conduct, words and silence that it was not only "business as usual," but that Bunkering and BTU were financially sound enough to expand business opportunities with

Cosulich, which was being actively promoted and marketed in these meetings.

107. On this occasion, BTU and Brito, including their agents, servants and employees, expressly misrepresented the true financial condition of Bunkering and/or BTU and suppressed and concealed the true, dire status of Bunkering's business operations and financial condition from Cosulich.

108. Acting with the intent to deceive one of Bunkering's creditors, namely, Cosulich, BTU and/or Brito, acting either individually or in conspiracy with one another, or any combination of same, committed fraud in insolvency by, among other things,

      a.    conveying, transferring, removing, concealing, destroying, encumbering or otherwise disposing of assets of and/or interests in Bunkering's and/or BTU's estate;

      b.    presenting false material information to Cosulich regarding the financial condition and solvency of Bunkering and/or BTU; and/or,

      c.    not disclosing and suppressing the true facts concerning the worsening and failing financial condition(s) of Bunkering and/or BTU.

109. At all times material to this Amended Complaint, BTU and/or Brito

had actual or implied knowledge that proceedings had been or were about to be instituted for the dissolution, bankruptcy or appointment of a receiver for Bunkering within the meaning of Alabama Code §13A-9-48 [**Fraud in Insolvency**].

110.   Cosulich was, and is, a member of a class which was intended by the Alabama Legislature to be protected by this statute.

111.   BTU and Brito engaged in fraud, suppression and deceit to conceal the true financial condition and insolvency of Bunkering and BTU from Cosulich, a member of the protected class.

112.   At all times material to this Amended Complaint, BTU and Brito engaged, jointly and separately, in a plan, scheme or artifice to defraud Cosulich by misrepresenting and concealing Bunkering and/or BTU's financial condition and insolvency in violation of Alabama Code §13A-9- 48 [**Fraud in Insolvency**].

113.   Cosulich claims a private right of action against BTU and/or Brito for violation of Alabama Code §13A-9- 48 [**Fraud in Insolvency**].

114.   As a proximate result of BTU and Brito's violation of the provisions of Alabama Code §13A-9-48 [**Fraud in Insolvency**], either individually or in conspiracy with one another or any combination of same, Cosulich was injured and damaged in the amount of **$4,625,117.52**, plus interest.

115. At all times material, BTU and Brito, by and through their agents, servants and employees, acted, jointly and separately, with a reckless and conscious disregard for the rights of Cosulich, making an award of punitive damages warranted under the facts and circumstances.

WHEREFORE, premises considered, Fratelli Cosulich Unipessoal, S.A. (formerly known as "Fratelli Cosulich Consultadoria E Participacoes Unipessoal, LDA"), demands judgment against the Defendants, Specialty Fuels BTU, LLC, and F. Javier Brito, jointly and separately, for compensatory damages in the amount of **$4,625,117.52**, plus interest, punitive damages as may be determined by the jury, and costs of Court.

### Count Eight
### (Negligence - BI)

116. Cosulich refers to the factual allegations of paragraphs 1 through 50 for context; specifically adopts and alleges the allegations of paragraphs 5, 8 through 39, 43, and 45 through 46 as to BI; adopts and alleges paragraphs 2, through 4, 8 through 10, 13, 14, 22 through 24, 26 through 37, 39 through 50 as to BTU and Brito; and alleges as to BI the following:

117. At all times material to this Amended Complaint, BI, acting through its agents, servants and employees including, but not limited to, its CEO, John Canal, and "Vice President of Business Development and Strategic Initiatives",

Paul Pappaceno, owed direct duties of reasonable care to Cosulich.

118. BI is vicariously liable under *respondeat superior* for the acts and omissions of its agents, including, but not limited to, John Canal and Paul Pappaceno.

119. At all times material, and based upon a past course of conduct and the totality of the circumstances, BI served as the exclusive broker for Cosulich and was obligated to exercise reasonable care with respect to its brokering activities including, but not limited to, warning and informing Cosulich of any material, adverse financial conditions that would materially increase the risk of extending credit terms to Bunkering, BTU and Brito, than had otherwise existed consistent with past course of dealings.

120. BI knew or should have known about Bunkering, BTU and Brito's ever worsening and failing financial condition due to its insider position and its unique, close business relationship with Bunkering, BTU and Brito, all of which it represented to Cosulich as a means to promote reliability and trustworthiness of its information and solicitations based upon its past business ventures with those entities and Brito.

121. BI insisted on serving as the sole and exclusive intermediary between Bunkering, BTU, and Brito on the one hand and Cosulich on the other. Through

this insistence, Cosulich was dependent and reliant on BI to provide it with timely and reasonably accurate, material information regarding the risks attendant to the transactions, particularly if the material circumstances concerning Bunkering, BTU and Brito's ability to pay had changed for the worse.

122. BI knew of this dependency and reliance by Cosulich for timely, reliable and accurate information because it was BI that insisted on serving as Cosulich's sole intermediary with "Specialty" and that, as a result, it had a duty of reasonable care and disclosure to Cosulich.

123. BI negligently breached its duties of reasonable care with respect to Cosulich by, but not limited to, the following:

    a.    recommending and vouching for Bunkering, BTU and Brito as sound, commercially viable, stable, competent and suitable business partners for Cosulich when the opposite was true;

    b.    failing to exercise reasonable due diligence in determining the financial condition and well-being of Bunkering and/or BTU and truthfully advising Cosulich as to same, particularly given BI's relationship and insider position with Bunkering, BTU and Brito;

    c.    failing to warn or provide current, relevant, material

information to Cosulich of Bunkering and/or BTU's deteriorating financial position over time while continuing to seek, over that same time period, continued participation by Cosulich in Bunkering and BTU's business enterprise;

d.  failing to advise or warn Cosulich of the litigation between Brito and Cleveland, and the allegations of fraud, mismanagement, waste, misappropriation of corporate funds, corporate insolvency, planned dissolution of Bunkering, the filing of a motion seeking judicial dissolution of Bunkering; that the Warehouse Receipt was false and worthless; and that Cosulich's funds were not secured by collateral; and,

e.  failing to advise or warn Cosulich of material adverse financial information pertaining to Bunkering and BTU prior to Jan 2013 including that Bunkering and/or BTU were alleged to be in default of debts owed to BI, that BI was contemplating in rem proceedings against Bunkering and/or BTU customers, and that BI was no longer providing funds to Bunkering, BTU or Brito, thereby preventing them from conducting business as normal, while continuing to solicit financial participation by Cosulich;

124. As a proximate result of these and other negligent breaches of legal duties owed by BI, Cosulich continued to do business with a failing business enterprise and suffered injury and damage in the amount of **$4,625,117.52**, plus interest.

WHEREFORE, premises considered, Fratelli Cosulich Unipessoal, S.A. (formerly known as "Fratelli Cosulich Consultadoria E Participacoes Unipessoal, LDA"), demands judgment against the Defendant, Bunkers International Corporation, for compensatory damages in the amount of **$4,625,117.52**, plus interest, and costs of Court.

### Count Nine
### (Wantonness - BI)

125. Cosulich refers to the factual allegations of paragraphs 1 through 50 for context; specifically adopts and alleges the allegations of paragraphs 5, 8 through 39, 43, and 45 through 46 as to BI; adopts and alleges paragraphs 2, through 4, 8 through 10, 13, 14, 22 through 24, 26 through 37, 39 through 50 as to BTU and Brito; and alleges as to BI the following:

126. At all times material to this Amended Complaint, BI, acting through its agents, servants and employees including, but not limited to, its CEO, John Canal, and "Vice President of Business Development and Strategic Initiatives", Paul Pappaceno, owed direct duties of reasonable care to Cosulich.

127. BI is vicariously liable under *respondeat superior* for the acts and omissions of its agents, including, but not limited to, John Canal and Paul Pappaceno.

128. At all times material, and based upon a past course of conduct and the totality of the circumstances, BI served as the exclusive broker for Cosulich and was obligated to exercise reasonable care with respect to its brokering activities including, but not limited to, warning and informing Cosulich of any material, adverse financial conditions that would materially increase the risk of extending credit terms to Bunkering, BTU and Brito, than had otherwise existed consistent with past course of dealings.

129. BI knew or should have known about Bunkering, BTU and Brito's ever worsening and failing financial condition due to its insider position and its unique, close business relationship with Bunkering, BTU and Brito, all of which it represented to Cosulich as a means to promote reliability and trustworthiness of its information and solicitations based upon its past business ventures with those entities and Brito.

130. BI insisted on serving as the sole and exclusive intermediary between Bunkering, BTU, and Brito on the one hand and Cosulich on the other. Through this insistence, Cosulich was dependent and reliant on BI to provide it with timely

and reasonably accurate, material information regarding the risks attendant to the transactions, particularly if the material circumstances concerning Bunkering, BTU and Brito's ability to pay had changed for the worse.

131. BI knew of this dependency and reliance by Cosulich for timely, reliable and accurate information because it was BI that insisted on serving as Cosulich's sole intermediary with "Specialty" and that, as a result, it had a duty of reasonable care and disclosure to Cosulich.

132. BI acted with a conscious and reckless disregard for the rights of Cosulich and wantonly breached its duties of reasonable care with respect to Cosulich by, but not limited to, the following:

    a.     recommending and vouching for Bunkering, BTU and Brito as sound, commercially viable, stable, competent and suitable business partners for Cosulich when the opposite was true;

    b.     failing to exercise reasonable due diligence in determining the financial condition and well-being of Bunkering and/or BTU and truthfully advising Cosulich as to same, particularly given BI's relationship and insider position with Bunkering, BTU and Brito;

    c.     failing to warn or provide current, relevant, material

information to Cosulich of Bunkering and/or BTU's deteriorating financial position over time while continuing to seek, over that same time period, continued participation by Cosulich in Bunkering and BTU's business enterprise;

d. failing to advise or warn Cosulich of the litigation between Brito and Cleveland, and the allegations of fraud, mismanagement, waste, misappropriation of corporate funds, corporate insolvency, planned dissolution of Bunkering, the filing of a motion seeking judicial dissolution of Bunkering; that the Warehouse Receipt was false and worthless; and that Cosulich's funds were not secured by collateral; and,

e. failing to advise or warn Cosulich of material adverse financial information pertaining to Bunkering and BTU prior to Jan 2013 including that Bunkering and/or BTU were alleged to be in default of debts owed to BI, that BI was contemplating in rem proceedings against Bunkering and/or BTU customers, and that BI was no longer providing funds to Bunkering, BTU or Brito, thereby preventing them from conducting business as normal, while continuing to solicit financial participation by Cosulich;

133. As a proximate result of these and other wanton breaches of legal duties owed by BI, Cosulich continued to do business with a failing business enterprise and suffered injury and damage in the amount of **$4,625,117.52**, plus interest.

134. At all times material, BI, by and through its agents, servants and employees, acted with a reckless and conscious disregard for the rights of Cosulich such that it was wanton, making an award of punitive damages warranted under the facts and circumstances.

WHEREFORE, premises considered, Fratelli Cosulich Unipessoal, S.A. (formerly known as "Fratelli Cosulich Consultadoria E Participacoes Unipessoal, LDA"), demands judgment against the Defendant, Bunkers International Corporation, for compensatory damages in the amount of **$4,625,117.52**, plus prejudgment interest, punitive damages as may be determined by the jury, and costs of Court.

### Count Ten
### (Negligence)
### (Breach of Fiduciary/Broker Duties - BI)

135. Cosulich refers to the factual allegations of paragraphs 1 through 50 for context; specifically adopts and alleges the allegations of paragraphs 5, 8 through 39, 43, and 45 through 46 as to BI; adopts and alleges paragraphs 2,

through 4, 8 through 10, 13, 14, 22 through 24, 26 through 37, 39 through 50 as to BTU and Brito; and alleges as to BI the following:

136. At all times material to this Amended Complaint, BI, as Cosulich's exclusive broker and agent, acting through its agents, servants and employees including, but not limited to, its CEO, John Canal, and "Vice President of Business Development and Strategic Initiatives", Paul Pappaceno, owed direct duties of reasonable care to Cosulich.

137. The duties owed by BI to Cosulich arose from its position as Cosulich's exclusive broker and agent which placed BI into a position of trust (fiduciary) or otherwise were created by the special relationship between BI and Bunkering and Brito under the facts and circumstances of this case as aforesaid.

138. BI is vicariously liable under *respondeat superior* for the acts and omissions of its agents, servants, and employees, including, but not limited to, John Canal and Paul Pappaceno.

139. BI insisted on serving as the sole and exclusive intermediary between Bunkering, BTU, and Brito on the one hand and Cosulich on the other. Through this insistence, Cosulich was dependant and reliant on BI to provide it with timely and reasonably accurate, material information regarding the risks attendant to the transactions, particularly if the material circumstances concerning Bunkering, BTU

and Brito's ability to pay had changed for the worse.

140. BI knew of this dependency and reliance by Cosulich because it was BI that insisted on serving as Cosulich's sole intermediary with "Specialty". This fact, among others, created a fiduciary or special relationship between BI and Cosulich such that BI had duties of care and disclosure of material facts with respect to Cosulich and the business transactions which it brokered exclusively for Cosulich.

141. BI negligently breached those duties by, but not limited to, the following:

    a.    recommending and vouching for Bunkering, BTU and Brito as sound, commercially viable, stable, competent and suitable business partners for Cosulich when the opposite was true;

    b.    making unfounded representations that induced reliance on the part of Cosulich and gave Cosulich a false sense of security;

    c.    failing to possess a degree of competent skill to perform the duties of broker under these circumstances;

    d.    failing to adhere to industry standards;

    e.    failing to adequately supervise Pappaceno in the performance of his broker duties to Cosulich;

f.    failing to exercise reasonable due diligence in monitoring and determining the financial condition and well-being of Bunkering and/or BTU and truthfully advising Cosulich as to same, particularly given BI's relationship and insider position with Bunkering, BTU and Brito;

g.    failing to warn Cosulich of Bunkering and/or BTU's failing financial position over time while continuing to market Bunkering and BTU to Cosulich and seek continued participation by Cosulich in Bunkering and BTU's business enterprise(s);

h.    failing to advise or warn Cosulich of the litigation between Brito and Cleveland, the allegations of fraud, mismanagement, waste, misappropriation of corporate funds, corporate insolvency, planned dissolution, filed motion seeking judicial dissolution of Bunkering, that the Warehouse Receipt was false and worthless and that the funds provided by Cosulich to "Specialty" were, in fact, unsecured;

i.    failing to advise or warn Cosulich that Bunkering and/or BTU was in default of debts owed to BI, that BI was contemplating

in rem proceedings against Bunkering and/or BTU customers, and that BI was no longer providing funds to Bunkering, BTU or Brito, thereby preventing them from conducting business as normal, while continuing to solicit financial participation by Cosulich; and,

j.    failing to exercise sound and reasonable judgment as agent and broker on behalf of its principal, Cosulich.

142.    As a proximate result of the negligent breach of these duties and other breaches of trust and fiduciary responsibilities owed by BI, Cosulich suffered injury and damage in the amount of **$4,625,117.52**, plus interest.

WHEREFORE, premises considered, Fratelli Cosulich Unipessoal, S.A. (formerly known as "Fratelli Cosulich Consultadoria E Participacoes Unipessoal, LDA"), demands judgment against the Defendant, Bunkers International Corporation, for compensatory damages in the amount of **$4,625,117.52**, plus interest and costs of Court.

### Count Eleven
### (Wantonness)
### (Breach of Fiduciary/Broker Duties - BI)

143.    Cosulich refers to the factual allegations of paragraphs 1 through 50 for context; specifically adopts and alleges the allegations of paragraphs 5, 8

through 39, 43, and 45 through 46 as to BI; adopts and alleges paragraphs 2, through 4, 8 through 10, 13, 14, 22 through 24, 26 through 37, 39 through 50 as to BTU and Brito; and alleges as to BI the following:

144.　At all times material to this Amended Complaint, BI, as Cosulich's exclusive broker and agent, acting through its agents, servants and employees including, but not limited to, its CEO, John Canal, and "Vice President of Business Development and Strategic Initiatives", Paul Pappaceno, owed direct duties of reasonable care to Cosulich.

145.　The duties owed by BI to Cosulich arose from its position as Cosulich's exclusive broker and agent which placed BI into a position of trust (fiduciary) or otherwise were created by the special relationship between BI and Bunkering and Brito under the facts and circumstances of this case as aforesaid.

146.　BI is vicariously liable under *respondeat superior* for the acts and omissions of its agents, servants, and employees, including, but not limited to, John Canal and Paul Pappaceno.

147.　BI insisted on serving as the sole and exclusive intermediary between Bunkering, BTU, and Brito on the one hand and Cosulich on the other. Through this insistence, Cosulich was dependant and reliant on BI to provide it with timely and reasonably accurate, material information regarding the risks attendant to the

transactions, particularly if the material circumstances concerning Bunkering, BTU and Brito's ability to pay had changed for the worse.

148.  BI knew of this dependency and reliance by Cosulich because it was BI that insisted on serving as Cosulich's sole intermediary with "Specialty". This fact, among others, created a fiduciary or special relationship between BI and Cosulich such that BI had duties of care and disclosure of material facts with respect to Cosulich and the business transactions which it brokered exclusively for Cosulich.

149.  BI acted with a reckless and conscious disregard for the rights of Cosulich and wantonly breached those duties by, but not limited to, the following:

  a.  recommending and vouching for Bunkering, BTU and Brito as sound, commercially viable, stable, competent and suitable business partners for Cosulich when the opposite was true;

  b.  making unfounded representations that induced reliance on the part of Cosulich and gave Cosulich a false sense of security;

  c.  failing to possess a degree of competent skill to perform the duties of broker under these circumstances;

  d.  failing to adhere to industry standards;

  e.  failing to adequately supervise Pappaceno in the performance of

his broker duties to Cosulich;

f.      failing to exercise reasonable due diligence in monitoring and determining the financial condition and well-being of Bunkering and/or BTU and truthfully advising Cosulich as to same, particularly given BI's relationship and insider position with Bunkering, BTU and Brito;

g.      failing to warn Cosulich of Bunkering and/or BTU's failing financial position over time while continuing to market Bunkering and BTU to Cosulich and seek continued participation by Cosulich in Bunkering and BTU's business enterprise(s);

h.      failing to advise or warn Cosulich of the litigation between Brito and Cleveland, the allegations of fraud, mismanagement, waste, misappropriation of corporate funds, corporate insolvency, planned dissolution, filed motion seeking judicial dissolution of Bunkering, that the Warehouse Receipt was false and worthless and that the funds provided by Cosulich to "Specialty" were, in fact, unsecured;

i.      failing to advise or warn Cosulich that Bunkering and/or BTU

was in default of debts owed to BI, that BI was contemplating in rem proceedings against Bunkering and/or BTU customers, and that BI was no longer providing funds to Bunkering, BTU or Brito, thereby preventing them from conducting business as normal, while continuing to solicit financial participation by Cosulich; and,

j.      failing to exercise sound and reasonable judgment as agent and broker on behalf of its principal, Cosulich.

150.    As a proximate result of the wanton breach of these duties and other breaches of trust and fiduciary responsibilities owed by BI, Cosulich suffered injury and damage in the amount of **$4,625,117.52**, plus interest.

151.    At all times material, BI acted with a reckless and conscious disregard for the rights of Cosulich such that it was wanton, making an award of punitive damages warranted under the facts and circumstances.

WHEREFORE, premises considered, Fratelli Cosulich Unipessoal, S.A. (formerly known as "Fratelli Cosulich Consultadoria E Participacoes Unipessoal, LDA"), demands judgment against the Defendant, Bunkers International Corporation, for compensatory damages in the amount of **$4,625,117.52**, punitive damages as the jury may assess, plus interest and costs of Court.

## Count Twelve
## (Piercing Corporate Veil)

152.   Cosulich refers to the factual allegations of paragraphs 1 through 50 for context; adopts and alleges paragraphs 2, through 4, 8 through 10, 13, 14, 22 through 24, 26 through 37, 39 through 50 as to BTU and Brito; and alleges as to BTU and Brito the following:

153.   Based upon allegations pled in the Baldwin County litigation, assets of Bunkering and BTU (which could have been used to satisfy the indebtedness owed to Cosulich) were misappropriated or converted to the personal use of Brito who disregarded corporate form and used Bunkering and/or BTU as a sham or subterfuge for his own personal financial gain, subverting the rights of others and to the financial detriment of Cosulich.

154.   At all times material to this Third Amended Complaint, Brito as the managing member of Bunkering and sole owner of BTU, engaged in conduct which would justify the disregarding of each corporate entity in order to pierce the corporate veil so as to impose, in equity, liability on Brito individually for the acts, errors, omissions, frauds, debts and other obligations of Bunkering and BTU.

155.   Further, BTU, as an entity solely owned, managed and controlled by Brito, was used by him and others as the alter ego of Bunkering so as to cause others, including Cosulich, to believe that both entities were "one and the same"

(i.e., "Specialty") such that doing business with one was the same as doing business with the other. See, Exhibits "A" and "B". In that regard, BTU was in fact the alter ego of Bunkering.

156. Such conduct includes, but is not limited to,

    a.    completely disregarding corporate form as to both entities, Bunkering and BTU;

    b.    failing to comply with corporate law and engaging in *ultra vires* acts;

    c.    failing to maintain corporate records and financial books;

    d.    engaging in fraudulent misconduct;

    e.    treating corporate assets as their own;

    f.    misappropriating, conveying and/or transferring corporate funds and assets for their own personal financial gain to the exclusion and detriment of Bunkering and BTU's creditors including Cosulich;

    g.    treating both corporate entities as one and the same or alter egos of each other;

    h.    leading others to believe and have the impression that both entities were one and the same; and,

i. creating these and other sham corporate entities, such as Kudzu Marine, as a part of a plan, scheme or artifice to subvert the rights of and to defraud others, including Cosulich.

157. As a proximate consequence of Brito's conduct, the Court should, in equity, disregard the corporate form and allow recovery by Cosulich against him personally for the debts and other liabilities of Bunkering and/or BTU.

WHEREFORE, premises considered, Fratelli Cosulich Unipessoal, S.A. (formerly known as "Fratelli Cosulich Consultadoria E Participacoes Unipessoal, LDA"), demands judgment against the Defendant, F. Javier Brito, individually, and for all liabilities of Specialty Fuels Bunkering, LLC, debtor in Chapter 7 bankruptcy, and Specialty Fuels BTU, LLC, in the form compensatory damages in the amount of **$4,625,117.52**, plus interest, punitive damages as may be determined by the jury, and costs of Court.

### Count Eleven
### (Claim for Equitable/Injunctive Relief)

158. Cosulich adopts and realleges the allegations contained in paragraphs 2, through 4, 8 through 10, 13, 14, 22 through 24, 26 through 37, 39 through 50 as to BTU and Brito as if fully set forth herein.

159. A various times material to this Third Amended Complaint, Bunkering, BTU and Brito, through their agents, servants and employees, or

authorized representatives, represented, jointly and separately, to Cosulich that some or their entire joint and/or several indebtedness to Cosulich is secured by product. See "Warehouse Receipt", Exhibit "C".

160. Cosulich faces imminent and irreparable injury and harm if BTU or Brito, and those acting with their authority, are not restrained from selling or otherwise disposing of product securing said indebtedness. Such damage has no adequate remedy at law and is not compensable in money damages as Bunkering is now in bankruptcy and BTU, on information and belief, is insolvent.

161. Cosulich has a substantial likelihood of prevailing on the merits of this dispute.

162. BTU is indebted to Cosulich and may retain all or a substantial portion of product which is held as security for the indebtedness sued upon. BTU and/or its sole member, Brito, have refused to provide or pledge other security to Cosulich and will be unjustly enriched by selling or otherwise disposing of this security without satisfying its indebtedness to Cosulich.

163. Cosulich is prepared to post a reasonable bond as may be required by the Court to secure the injunctive relief sought herein.

164. Accordingly, Cosulich seeks equitable remedies against BTU and Brito including, but not limited to, a temporary restraining order, preliminary and

permanent injunctions, and other relief consisting of the following:

    a.    accepting jurisdiction over this cause and setting of an immediate hearing thereon to consider the issuance of a temporary restraining order;

    b.    to immediately establish an equitable lien in favor of Cosulich with respect to any product held as security for the indebtedness sued upon;

    c.    restraining and enjoining BTU and Brito, including their agents, servants and employees, and anyone under its direction and control, from selling, disposing or in any way transferring any product held as security for the indebtedness sued upon herein either through these proceedings or through bankruptcy court in Bunkering's Chapter 7 proceedings;

    d.    requiring that the *status quo* be maintained and no further product sold, conveyed, transported, delivered, consumed or otherwise disposed of without further order and approval of this Court or as may be appropriate, the bankruptcy court in Bunkering's Chapter 7 proceedings; and,

    e.    taxing costs of this action to BTU and/or together with such

other, further relief as may be appropriate at law or in equity, including an award of reasonable attorneys' fees.

WHEREFORE, premises considered, Fratelli Cosulich Unipessoal, S.A. (formerly known as "Fratelli Cosulich Consultadoria E Participacoes Unipessoal, LDA"), demands pre-judgment seizure of assets and other equitable/injunctive relief against the Defendant, Specialty Fuels BTU, LLC, and F. Javier Brito, including their agents, servants, and employees, plus prejudgment interest, attorney's fees, costs and other relief both legal and equitable as may be deemed appropriate by the Court.

**PLAINTIFF RESPECTFULLY REQUESTS TRIAL AS TO ALL CLAIMS BY STRUCK JURY**.

Respectfully submitted,

*/s/ Charles J. Potts*
CHARLES J. POTTS (POTTC0053)
Attorney for Plaintiff, Fratelli Cosulich
Unipessoal, S.A. (formerly known as
"Fratelli Cosulich Consultadoria E
Participacoes Unipessoal, LDA")

OF COUNSEL:
BRISKMAN & BINION
205 Church Street
Mobile, Alabama 36601
t.251.433.7600
f.251.433.4485
cpotts@briskman-binion.com

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on the 23rd day of September, 2014, I have caused a true and correct copy of the foregoing to be served upon the following via the Court's CM/ECF system:

James B. Newman, Esq.
Counsel for Defendant – Specialty
Fuels, BTU, LLC, & F. Javier Brito
Helmsing, Leach, Herlong, Newman & Rouse
P.O. Box 2767
Mobile, AL 36652

Paul T. Beckmann, Esq.
Windy C. Bitzer, Esq.
Hand Arendall
Post Office Box 123
Mobile, Alabama 36601

J. Stephen Simms, Esq.
Marios J. Monopolis, Esq.
Simms Showers, LLP
201 International Circle, Suite 250
Hunt Valley, Maryland 21030

Stephan Skoufalos, Esq.
Skoufalos, LLC
300 First Stamford Place
Stamford, CT 06902

/s/ Charles J. Potts
OF COUNSEL





**THANK YOU FOR YOUR BUSINESS**

## BULK SALE INVOICE

| DATE FUELED | INVOICE # |
|---|---|
| 17-Apr-13 | 130416-1 |

**BILL TO:**
Fratelli Cosulich, Unipessoal S.A.

**SHIP TO:**
Fratelli Cosulich, Unipessoal S.A.
Rua Queimada de Baixo,
SA - 1º Andar
Funchal, Madeira 9000-068
Portugal

| SHIP VIA | PORT | | TERMS | DUE DATE | INVOICE DATE |
|---|---|---|---|---|---|
| ABT Tank 2/ARC Tank 1 | Mobile, AL | | DOR | 18-Apr-13 | 17-Apr-13 |

| DESCRIPTION | PRODUCT | QUANTITY | RATE | AMOUNT |
|---|---|---|---|---|
| Bulk sale to Fratelli Cosulich, Unipessoal S.A. made on, by, or into ABT Tank 2/ARC Tank 16. | #2 Diesel | 23500 | $ 127.00 | $ 2,984,500.00 |

**NO CHECKS ACCEPTED**
**NO BANK DEDUCTIONS ALLOWED**

Buyer PO #:

| | TOTAL: | $ 2,984,500.00 |
|---|---|---|

Please remit wire payment to:
BBVA Compass Bank
Birmingham, AL
ABA/ACH # 062001186
For further credit to:
Specialty Fuels Bunkering
Account # 2527468062





EXHIBIT
A

# Fratelli Cosulich

## FRATELLI COSULICH CONSULTADORIA E PARTICIPAÇÕES UNIPESSOAL, LDA

AVENIDA ARRIAGA 34 4 ANDAR SALA B - FUNCHAL - MADEIRA 9000-064 - VAT PT511247052

**Pro forma Invoice: 6322**

M/V ABT TANK 2 and/or OWNERS and/or
CHARTERERS and/or OPERATORS and/or
**SPECIALTY FUELS**
**P.O. BOX 2483**
**36652 MOBILE AL**
**VAT: 999999994**

| | |
|---|---|
| Date : | **April 22, 2013** |
| Port: | **MOBILE** |
| Delivery: | **April 17, 2013** |
| Stem Nº: | **6322** |

| Product | Qty | Cur | Un Price | Total |
|---|---|---|---|---|
| ISO 8217:2005 DMA | 12,598.425 BBL | USD | 129.60 | 1,632,755.88 |

### Invoice Total: USD 1632755.88

*Please make payment by telegraphic transfer, free of any bank charges.*

| Payment Terms | 60 Days from date of delivy |
|---|---|
| **Due date** | June 21, 2013 |
| **USD Account** | BENEFICIARY BANK: Wire remitance in immediately available U.S. funds to: BENEFICIARY BANK: UBS AG, SINGAPORE (SWIFT UBSWSGSG) BENEFICIARY: FRATELLI COSULICH CONSULTADORIA E PARTICIPAÇÕES LIMITADA " ACCOUNT NO. 11511610002 |
| **Penalties** | 1,5% PER MONTH PRORATED DAILY FROM DUE DATE |

## *Fratelli Cosulich* ®

## FRATELLI COSULICH CONSULTADORIA E PARTICIPAÇÕES UNIPESSOAL, LDA

AVENIDA ARRIAGA 34 4 ANDAR SALA B - FUNCHAL - MADEIRA 9000-064 - VAT PT511247052

Pro forma invoice: **6322**

**M/V ABT TANK 2** and/or OWNERS and/or
CHARTERERS and/or OPERATORS and/or
**SPECIALTY FUELS**
**P.O. BOX 2483**
**36652 MOBILE AL**
**VAT: 999999994**

| | |
|---|---|
| Date : | **May 29, 2013** |
| Port: | **MOBILE** |
| Delivery: | **April 22, 2013** |
| Stem Nº: | **6322** |

| Product | Qty | Cur | Un. Price | Total |
|---|---|---|---|---|
| ISO 8217:2005 DMA | 12,598.425 BBL | USD | 128.30 | 1,616,377.93 |

### Invoice Total: USD 1616377.93

Please make payment by telegraphic transfer, free of any bank charges.

| Payment Terms | 30 Days from date of delivery |
|---|---|
| **Due date** | May 22, 2013 |
| **USD Account** | BENEFICIARY BANK:Wire remitance in immediately available U.S. funds to: BENEFICIARY BANK: UBS AG, SINGAPORE (SWIFT UBSWSGSG) BENEFICIARY: FRATELLI COSULICH CONSULTADORIA E PARTICIPAÇÕES LIMITADA * ACCOUNT NO. 11511610002 INTERMEDIARY BANK:UBS AG, STAMFORD BRANCH Swift: UBSWUS33 For account of: UBS AG, SINGAPORE ACCT NO: 101-WA-216003-000 |
| Penalties | 1,5% PER MONTH PRORATED DAILY FROM DUE DATE |

## Fratelli Cosulich®

### FRATELLI COSULICH CONSULTADORIA E PARTICIPAÇÕES UNIPESSOAL, LDA

AVENIDA ARRIAGA 34 4 ANDAR SALA B - FUNCHAL - MADEIRA 9000-064 - VAT PT511247052

*Pro forma invoice:* **6322**

M/V **ABT TANK 2** and/or OWNERS and/or
CHARTERERS and/or OPERATORS and/or
**SPECIALTY FUELS**
**P.O. BOX 2483**
**36652 MOBILE AL**
**VAT: 999999994**

| | |
|---|---|
| *Date :* | **May 29, 2013** |
| *Port:* | **MOBILE** |
| *Delivery:* | **May 21, 2013** |
| *Stem N°:* | **6322** |

| Product | Qty | Cur | Un. Price | Total |
|---|---|---|---|---|
| ISO 8217:2005 DMA | 10,901.574 BBL | USD | 128.30 | 1,398,671.94 |

### Invoice Total: USD 1398671.94

*Please make payment by telegraphic transfer, free of any bank charges.*

| Payment Terms | 30 Days from date of delivery |
|---|---|
| **Due date** | June 20, 2013 |
| USD Account | BENEFICIARY BANK:Wire remitance in immediately available U.S. funds to: BENEFICIARY BANK: UBS AG, SINGAPORE (SWIFT UBSWSGSG) BENEFICIARY: FRATELLI COSULICH CONSULTADORIA E PARTICIPAÇÕES LIMITADA * ACCOUNT NO. 11511610002 INTERMEDIARY BANK:UBS AG, STAMFORD BRANCH Swift: UBSWUS33 For account of: UBS AG, SINGAPORE ACCT NO: 101-WA-216003-000 |
| Penalties | 1,5% PER MONTH PRORATED DAILY FROM DUE DATE |



# FRATELLI COSULICH CONSULTADORIA E PARTICIPAÇÕES UNIPESSOAL, LDA

AVENIDA ARRIAGA 34 4 ANDAR SALA B - FUNCHAL - MADEIRA 9000-064 - VAT PT511247052

Pro forma Invoice: **6322**

**M/V ABT TANK 2** and/or OWNERS and/or
CHARTERERS and/or OPERATORS and/or
**SPECIALTY FUELS**
**P.O. BOX 2483**
**36652 MOBILE AL**
**VAT: 999999994**

| | |
|---|---|
| Date : | **July 10, 2013** |
| Port: | **MOBILE** |
| Delivery: | **May 21, 2013** |
| Stem Nº: | **6322** |

| Product | Qty | Cur. | Un. Price | Total |
|---|---|---|---|---|
| ISO 8217:2005 DMA | 10,901.574 BBL | USD | 129.60 | 1,412,843.99 |

### Invoice Total: USD 1412843.99

Please make payment by telegraphic transfer, free of any bank charges.

| Payment Terms | 60 Days from date of delivery |
|---|---|
| Due date | July 19, 2013 |
| USD Account | BENEFICIARY BANK: Wire remitance in immediately available U.S. funds to: BENEFICIARY BANK: UBS AG, SINGAPORE (SWIFT UBSWSGSG) BENEFICIARY: FRATELLI COSULICH CONSULTADORIA E PARTICIPAÇÕES LIMITADA * ACCOUNT NO. 11511610002 |
| Penalties | 1,5% PER MONTH PRORATED DAILY FROM DUE DATE |

# *Fratelli Cosulich*

## FRATELLI COSULICH CONSULTADORIA E PARTICIPAÇÕES UNIPESSOAL, LDA

AVENIDA ARRIAGA 34 4 ANDAR SALA B - FUNCHAL - MADEIRA 9000-064 - VAT PT511247052

**Pro forma Invoice: 6322**

M/V **ABT TANK 2** and/or OWNERS and/or
CHARTERERS and/or OPERATORS and/or
**SPECIALTY FUELS**
**P.O. BOX 2483**
**36652 MOBILE AL**
**VAT: 999999994**

| | |
|---|---|
| Date : | **April 22, 2013** |
| Port: | **MOBILE** |
| Delivery: | **April 17, 2013** |
| Stem Nº: | **6322** |

| Product | Qty | Cur | Un. Price | Total |
|---|---|---|---|---|
| ISO 8217:2005 DMA | 12,598.425 BBL | USD | 132.20 | 1,665,511.78 |

### Invoice Total: USD 1665511.78

*Please make payment by telegraphic transfer, free of any bank charges.*

| | |
|---|---|
| **Payment Terms** | 120 DAYS FROM DELIVERY DATE |
| **Due date** | August 20, 2013 |
| **USD Account** | BENEFICIARY BANK:Wire remitance in immediately available U.S. funds to: BENEFICIARY BANK: UBS AG, SINGAPORE (SWIFT UBSWSGSG) BENEFICIARY: FRATELLI COSULICH CONSULTADORIA E PARTICIPAÇÕES LIMITADA * ACCOUNT NO. 11511610002 |
| **Penalties** | 1,5% PER MONTH PRORATED DAILY FROM DUE DATE |

*Fratelli Cosulich*

**FRATELLI COSULICH CONSULTADORIA E PARTICIPAÇÕES UNIPESSOAL, LDA**

AVENIDA ARRIAGA 34 4 ANDAR SALA B - FUNCHAL - MADEIRA 9000-064 - VAT PT511247052

*Pro forma Invoice:* **6322**

M/V **ABT TANK 2** and/or OWNERS and/or
CHARTERERS and/or OPERATORS and/or
**SPECIALTY FUELS**
**P.O. BOX 2483**
**36652 MOBILE AL**
**VAT: 999999994**

| | |
|---|---|
| *Date :* | **July 25, 2013** |
| *Port:* | **MOBILE** |
| *Delivery:* | **May 21, 2013** |
| *Stem Nº:* | **6322** |

| Product | Qty | Cur | Uni Price | Total |
|---|---|---|---|---|
| ISO 8217:2005 DMA | 10,901.574 BBL | USD | 130.90 | 1,427,016.04 |

### Invoice Total: USD 1427016.04

*Please make payment by telegraphic transfer, free of any bank charges.*

| Payment Terms | 90 Days from date of delivery |
|---|---|
| **Due date** | August 19, 2013 |
| USD Account | BENEFICIARY BANK:Wire remitance in immediately available U.S. funds to: BENEFICIARY BANK: UBS AG, SINGAPORE (SWIFT UBSWSGSG) BENEFICIARY: FRATELLI COSULICH CONSULTADORIA E PARTICIPAÇÕES LIMITADA * ACCOUNT NO. 1151161000Z |
| Penalties | 1,5% PER MONTH PRORATED DAILY FROM DUE DATE |

# SPECIALTY FUELS BTU, LLC

THANK YOU
FOR YOUR
BUSINESS

## BULK SALE
## INVOICE

| DATE FUELED | INVOICE # |
|---|---|
| 11-Jan-13 | 130111-2 |

**BILL TO:**
Fratelli Cosulich LDA

**SHIP TO:**
Fratelli Cosulich LDA
c/o Asamar
Attn: Fabrizio Forghieri
125 Maiden Lane, Suite 209
New York, NY 10038
USA

| RECEIVED BY | PORT | TERMS | DUE DATE | INVOICE DATE |
|---|---|---|---|---|
| KDZ-101/KDZ-102 | Mobile, AL (Arc S/T 9) | 3 DOD | 14-Jan-13 | 11-Jan-13 |

| DESCRIPTION | PRODUCT | QUANTITY | RATE | AMOUNT |
|---|---|---|---|---|
| Bulk sale to Fratelli Cosulich LDA made on or into KDZ-101/KDZ-102. | Cutterstock | 22447 | $ 126.00 | $ 2,828,322.00 |
| | Delivery | 1 | $ . | $ . |

| | |
|---|---|
| NO CHECKS ACCEPTED | |
| NO BANK DEDUCTIONS ALLOWED | TOTAL: $ 2,828,322.00 |

Buyer PO #:

Please remit wire payment to:
Hancock Bank
Mobile, AL
ABA #: 065400153
For further credit to:
Specialty Fuels BTU
Account #: 00720769914



EXHIBIT
B



## FRATELLI COSULICH CONSULTADORIA E PARTICIPAÇÕES UNIPESSOAL, LDA

AVENIDA ARRIAGA 34 4 ANDAR SALA B - FUNCHAL - MADEIRA 9000-064 - VAT PT511247052

Pro forma invoice: **6277**

M/V **KDZ 101 - KDZ 102** and/or OWNERS and/or
CHARTERERS and/or OPERATORS and/or
**SPECIALTY FUELS**
**P.O. BOX 2483**
**36652 MOBILE AL**

Date : **January 14, 2013**
Port: **MOBILE**
Delivery:
Stem N°: **6277**

| Product | Qty | Cur | Un. Price | Total |
|---|---|---|---|---|
| Cutterstock | 22,447.000 BBL | USD | 127.30 | 2,857,503.10 |

## Invoice Total: USD 2857503.10

Please make payment by telegraphic transfer, free of any bank charges.

| Payment Terms | 30 Days from date of delivery |
|---|---|
| **Due date** | |
| USD Account | BENEFICIARY BANK:UBS AG, STAMFORD BRANCH Swift: UBSWUS33 For account of: UBS AG, SINGAPORE ACCT NO: 101-WA-216003-000<br>INTERMEDIARY BANK:UBS AG. SINGAPORE (Swift: UBSWSGSG)ACCT NO 11511610020 FRATELLI COSULICH CONSULTADORIA E PARTICIPACOES LDA |
| Penalties | 1,5% PER MONTH PRORATED DAILY FROM DUE DATE |



## FRATELLI COSULICH CONSULTADORIA E PARTICIPAÇÕES UNIPESSOAL, LDA

AVENIDA ARRIAGA 34 4 ANDAR SALA B - FUNCHAL - MADEIRA 9000-064 - VAT PT511247052

*Pro forma invoice:* **6277**

M/V **KDZ 101 - KDZ 102** and/or OWNERS and/or
CHARTERERS and/or OPERATORS and/or
**SPECIALTY FUELS**
**P.O. BOX 2483**
**36652 MOBILE AL**

| | |
|---|---|
| *Date :* | **February 27, 2013** |
| *Port:* | **MOBILE** |
| *Delivery:* | **January 14, 2013** |
| *Stem N°:* | **6277** |

| Product | Qty | Cur | Un. Price | Total |
|---|---|---|---|---|
| Cutterstock | 22,447.000 BBL | USD | 128.60 | 2,886,684.20 |

### Invoice Total: USD 2886684.20

*Please make payment by telegraphic transfer, free of any bank charges.*

| Payment Terms | 60 Days from date of delivery |
|---|---|
| **Due date** | March 15, 2013 |
| **USD Account** | BENEFICIARY BANK:UBS AG, STAMFORD BRANCH Swift: UBSWUS33 For account of: UBS AG, SINGAPORE ACCT NO: 101-WA-216003-000 INTERMEDIARY BANK:UBS AG, SINGAPORE (Swift: UBSWSGSG)ACCT NO 11511610020 FRATELLI COSULICH CONSULTADORIA E PARTICIPACOES LDA |
| *Penalties* | 1,5% PER MONTH PRORATED DAILY FROM DUE DATE |



**FRATELLI COSULICH CONSULTADORIA E PARTICIPAÇÕES UNIPESSOAL, LDA**

AVENIDA ARRIAGA 34 4 ANDAR SALA B - FUNCHAL - MADEIRA 9000-064 - VAT PT511247052

*Pro forma Invoice:* **6277**

M/V **KDZ 101 - KDZ 102** and/or OWNERS and/or
CHARTERERS and/or OPERATORS and/or
**SPECIALTY FUELS**
**P.O. BOX 2483**
**36652 MOBILE AL**

| | |
|---|---|
| *Date :* | **April 17, 2013** |
| *Port:* | **MOBILE** |
| *Delivery:* | **January 14, 2013** |
| *Stem Nº:* | **6277** |

| Product | Qty | Cur | Un.Price | Total |
|---|---|---|---|---|
| Cutterstock | 22,447.000 BBL | USD | 131.20 | 2,945,046.40 |

### Invoice Total: USD 2945046.40

*Please make payment by telegraphic transfer, free of any bank charges.*

| | |
|---|---|
| **Payment Terms** | 120 DAYS FROM DELIVERY DATE |
| **Due date** | May 14, 2013 |
| **USD Account** | BENEFICIARY BANK: Wire remitance in immediately available U.S. funds to: BENEFICIARY BANK: UBS AG, SINGAPORE (SWIFT UBSWSGSG) BENEFICIARY: FRATELLI COSULICH CONSULTADORIA E PARTICIPAÇÕES LIMITADA * ACCOUNT NO. 11511610002 |
| **Penalties** | 1,5% PER MONTH PRORATED DAILY FROM DUE DATE |



# FRATELLI COSULICH CONSULTADORIA E PARTICIPAÇÕES UNIPESSOAL, LDA

AVENIDA ARRIAGA 34 4 ANDAR SALA B - FUNCHAL - MADEIRA 9000-064 - VAT PT511247052

Pro forma Invoice: 6277

M/V KDZ 101 - KDZ 102 and/or OWNERS and/or
CHARTERERS and/or OPERATORS and/or
**SPECIALTY FUELS**
**P.O. BOX 2483**
**36652 MOBILE AL**
**VAT: 999999994**

| | |
|---|---|
| Date : | **April 17, 2013** |
| Port: | **MOBILE** |
| Delivery: | **January 14, 2013** |
| Stem Nº: | **6277** |

| Product | Qty | Cur | Un Price | Total |
|---|---|---|---|---|
| Cutterstock | 22,447.000 BBL | USD | 132.50 | 2,974,227.50 |

### Invoice Total: USD 2974227.50

Please make payment by telegraphic transfer, free of any bank charges.

| Payment Terms | 150 Days from date of delivery |
|---|---|
| Due date | June 13, 2013 |
| USD Account | BENEFICIARY BANK:Wire remitance in immediately available U.S. funds to: BENEFICIARY BANK: UBS AG, SINGAPORE (SWIFT UBSWSGSG) BENEFICIARY: FRATELLI COSULICH CONSULTADORIA E PARTICIPAÇÕES LIMITADA * ACCOUNT NO. 11511610002 |
| Penalties | 1,5% PER MONTH PRORATED DAILY FROM DUE DATE |



# FRATELLI COSULICH CONSULTADORIA E PARTICIPAÇÕES UNIPESSOAL, LDA

AVENIDA ARRIAGA 34 4 ANDAR SALA B - FUNCHAL - MADEIRA 9000-064 - VAT PT511247052

Pro forma Invoice: **6277**

M/V KDZ 101 - KDZ 102 and/or OWNERS and/or
CHARTERERS and/or OPERATORS and/or
**SPECIALTY FUELS**
**P.O. BOX 2483**
**36652 MOBILE AL**
**VAT: 999999994**

| | |
|---|---|
| Date : | **July 10, 2013** |
| Port: | **MOBILE** |
| Delivery: | **January 14, 2013** |
| Stem N°: | **6277** |

| Product | Qty | Cur | Un. Price | Total |
|---|---|---|---|---|
| Cutterstock | 22,447.000 BBL | USD | 135.10 | 3,032,589.70 |

### Invoice Total: USD 3032589.70

Please make payment by telegraphic transfer, free of any bank charges.

| Payment Terms | 210 Days from date of delivery |
|---|---|
| **Due date** | August 12, 2013 |
| **USD Account** | BENEFICIARY BANK:Wire remitance In Immediately available U.S. funds to: BENEFICIARY BANK: UBS AG, SINGAPORE (SWIFT UBSWSGSG) BENEFICIARY: FRATELLI COSULICH CONSULTADORIA E PARTICIPAÇÕES LIMITADA * ACCOUNT NO. 11511610002 |
| **Penalties** | 1,5% PER MONTH PRORATED DAILY FROM DUE DATE |

Date: April 8, 2013

**ABT**
Alabama Bulk Terminals
195 Cochrane Causeway
Mobile AL 36602

ISSUED TO

Fratelli Cosulich LOA
125 Malden Lane Suite 209
New York New York 10038

ON
BEHALF OF

Javier Brito Managing
Director
Specialty Fuels Inc./Specialty
Fuels Bunkering

160 St. Emanuel Street
Mobile AL 36602
251 694 9473

ISSUING DATE

April 8, 2013

ORDER

Custodial Rights to be held in the name
of Fratelli Cosulich

UCC ARTICLE 7 DEFINED

TANK #
LOCATION

TK 2 ABT

DESCRIPTION

12,500 bbls of Fuel Oil MDO with approximate valuation of $1,496,250 USD

QUANTITY
All contents of
TK 2

Signature of
Holdings SFB



## IN THE CIRCUIT COURT OF BALDWIN COUNTY, ALABAMA

SPECIALTY FUELS BUNKERING, LLC, )
)
    Plaintiff, )
)
vs. )
)
F. JAVIER BRITO, et al, )
)
                          ) CIVIL ACTION NO.: CV-2012-900676
    Defendant/Counterclaim Plaintiffs, )
)
vs. )
)
SCOTT CLEVELAND, et al, )
)
    Counterclaim Defendants. )

### Affidavit of F. Javier Brito

Now before the undersigned authority personally appeared F. Javier Brito, and after first being sworn, doth depose and say as follows:

1.    Specialty Fuels Bunkering, LLC was in the business of wholesale supply of fuel products. It operated by buying fuel components, blending them to make specific types of fuel, and then selling the finished fuel product to a buyer. Sometimes it sold fuel without the need to blend. This type of operation required enough capital or credit to be able to purchase the component parts of the fuel, store them, blend them, sell them, deliver the product, and then wait for payment. Included in the cost of doing business was the cost of employees, place of business, professional expense, office expense and other business expenses.

2.    After an initial period of financing, there was a business line of credit issued by Whitney /Hancock Bank. In addition, other alternative financing was sometimes done through private industry. In 2009 Whitney / Hancock expressed concern regarding a write off of monies



**EXHIBIT**

**D**

owed by MTT / Scott Cleveland in the amount of $ 800,000. Then in early 2011, Whitney /Hancock advised that it would not continue its line of credit to Specialty without personal guarantees and would no longer extend a line of credit to the company because of a $2,000,000.00 A/R from MTT / Scott Cleveland being carried on the balance sheet. (This was a result of MTT/Scott Cleveland withholding $2,000,000.00 intended for Specialty in financing monies sent from a third party) After that time, traditional commercial means of financing were not available to Specialty. Specialty, however, had other means open to it and pursued those although at significantly higher rates.

3. Specialty has participated in a factoring arrangement to help with its credit and cash flow, but this arrangement cost Specialty significant additional financing costs. In addition, it still did not provide adequate turnaround of funds for cash flow purposes. It was also cumbersome. For instance, when this lawsuit was filed, the factor was forced to pay money into court. This slowed turnaround. Some money still is deposited in this court.

4. Another alternative form of financing was to "monetize" the fuel products by selling them to a buyer on the promise that Specialty would buy them back at a higher price later or to make wholesale sales with a market discount to the buyer. Monetizing is less common in the industry but is used nonetheless. It is very expensive and requires additional inventory maintenance.

5. Specialty has engaged in all of these types of alternative financing arrangements to try to continue to do business. They have increased Specialty's borrowing costs substantially.

6. Even at high borrowing costs, these alternatives are now practically unavailable because Specialty's customers and companies providing financing are increasingly less willing or unwilling to continue to do business with Specialty. This is because of its financial condition

2

and the uncertainty surrounding its operations. In addition, banks dealing with the customers or companies providing financing have now prevented those entities from providing their resources to Specialty.

7. With minimal capital and expensive costs of borrowing, Specialty has been forced into a pattern of performing smaller transactions and fewer transactions. Smaller transactions can, and have, cut into profit margins since Specialty has missed out on some economies of scale. In addition, Specialty has not had adequate funds to hedge. Given the volatility of the market, this has resulted in additional profitability issues.

8. The increased market volatility and a market downturn also reduced transaction volumes which also hurt Specialty's capital and business position.

9. While Specialty has reduced its costs of providing logistics (such as storage and delivery), it cannot cut these costs any further.

10. The combination of lower sales volume, smaller transactions, and lower margins on the transactions have reduced the operating income of the company drastically.

11. Specialty now is operating at a negative equity position. In other words, its liabilities exceed its assets. As news of this position and news of this lawsuit spread through the industry, Specialty's traditional customers and financing entities became reluctant to do business with Specialty.

12. As a result of the setbacks referred to above, Specialty has now become a mere broker of fuels. It lacks the financial ability to purchase product, handle the logistics, and sell product to customers at a level that will cover the costs of logistics and operations. As a broker, Specialty cannot cover its own expenses or operational costs. In addition, it is concerned that it will leave more and more companies with bad debts.

13.    At this point, Specialty has no cash reserves, no available credit on terms that are viable to the continued operation of the business, and thus no way to continue to operate as it has operated in the past.

14.    Specialty cannot make a profit under these circumstances.

15.    Many of the companies that did business with Specialty, even given the foregoing issues, did so in reliance upon my reputation and relationships in the industry. In view of the financial situation and uncertainty involving Specialty, they are reluctant to continue. I cannot assure them that their debts will be paid.

16.    There is uncertainty over who are members of Specialty. Although I have contended that CCC is not a valid member, the Court has not granted my motion for summary judgment on this issue. The uncertainty over membership has led to a chaotic and confusing situation.

17.    There is uncertainty over who is the manager. That is one of many issues in this suit. The motions of the plaintiffs to replace me have been denied to date; however, the uncertainty has led to a chaotic and confusing situation.

18.    Uncertainty over membership and management has led directly to an inability to make long term plans and commitments. These are necessary to continue to operate and to deal with the financing issues referred to above.

19.    The motion for summary judgment to have Mr. Cleveland and MTT pay all of their debts to the company was denied. This included debt that was in addition to the amounts referred to in paragraph 2. The debts of Mr. Cleveland and MTT are substantial enough that, if paid, Specialty would not be experiencing the significant cash flow and financing issues it now experiences. Its financial position would improve to a point where financing could be obtained.

4

Although the claim remains pending, the shortfall from the lack of these funds has led to a situation where operations cannot be continued.

20.   Capital contributions by members cannot be compelled under the operating agreement.

21.   In March of 2013, Specialty was provided documentation indicating that its name and financial information had been used by Mr. Ford Graham to fraudulently raise money paid to the attention of Mr. Scott Cleveland. Part of the scheme involved using Specialty's own records. Continuing the business and continuing to provide financial records provides an additional vehicle for this to be done again.

22.   The constant distraction of this litigation also prevents the effective transaction of business. This includes the confusion caused by this litigation. Despite court rulings that have continued the management and operation of Specialty in me, the lawsuit, by its style and alignment, creates confusion in customers and companies that have done business with Specialty.

23.   That persons claiming 52% interest in Specialty are adverse to the business itself results in an inability to coordinate the business and run it smoothly and efficiently.


Further affiant sayeth not.

F. Javier Brito

## Acknowledgement

STATE OF ALABAMA
COUNTY OF MOBILE

Before me, the undersigned authority, personally appeared F. Javier Brito, who is known

to me, and stated that the within and foregoing affidavit is true and correct and that he executed

the same voluntarily this ___19th___ day of ___July___, 2013.

_Elizabeth M Laney_

NOTARY PUBLIC
Commission expires: _____

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: July 30, 2014
BONDED THRU NOTARY PUBLIC UNDERWRITERS

371433

6